Soheila RAHBARI, derivatively on behalf of Nominal Defendant NexCen Brands, Inc., Plaintiff,

v.

David OROS, Robert W. D'Loren, James T. Brady, Paul Caine, Jack B. Dunn IV, Edward J. Mathias, Jack Rovner, George Stamas and Marvin Traub, Defendants,

and

NexCen Brands, Inc., Nominal Defendant.

No. 08 Civ. 5843 (NRB).

United States District Court, S.D. New York.

July 30, 2010.

William Bernard Federman, Federman & Sherwood, Oklahoma City, OK, for Plaintiff.

Jasmine McGhee, Kyle Martin Deyoung, Ryan P. Phair, Wilmer Cutler Pickering Hale & Dorr L.L.P., Washington, DC, Alan Schoenfeld, David Michael Burkoff, Lori Ann Martin, Wilmer, Cutler, Hale & Dorr, L.L.P., New York, NY, for NexCen Brands and all individual defendants except D'Loren.

Gregg M. Mashberg, John Hoover Snyder, Proskauer Rose LLP, New York, NY, for Defendant Robert W. D'Loren.

## MEMORANDUM & ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff Soheila Rahbari brings this shareholder derivative complaint on behalf of nominal defendant NexCen Brands, Inc. alleging breach of fiduciary duty, abuse of control, gross mismanagement, unjust enrichment, and insider selling against the named individual directors' of NexCen from May 10, 2007 through the present based on their misrepresentations and failure to disclose known material adverse facts. Plaintiff further alleges that demand is excused futile because the directors face a substantial likelihood of liability or are not independent from those who face such a likelihood of liability.

1. The following facts are taken from the First Amended Shareholder Derivative Complaint ("Am. Comp."), except where otherwise noted, and are taken as true for the purposes of a

## BACKGROUND [1]

### A. Defendants

1. Nominal defendant *NexCen* is in the business of acquiring and managing global brands, which it licenses and franchises. Some of the franchised brands are retail footwear and accessory brands, including The Athlete's Foot and Shoebox New York, while others are quick-service restaurants, including Marble Slab Creamery, MaggieMoo's, Pretzel Time, Pretzelmaker, and Great American Cookies. NexCen is incorporated in the state of Delaware and has its principal executive offices in New York.

2. Defendant *David Pros* is the founder of NexCen. He serves as the Chairman of the board of directors and is the former Chief Executive Officer ("CEO"). Plaintiff further alleges that his principal source of income is the company in that he has continued to receive a $200,000 yearly salary in addition to his benefits, severance payments, and stock awards; which in 2006 resulted in total compensation of $356,214.

3. Defendant *Robert W. D'Loren,* a certified public accountant, served as the President and CEO of NexCen and as a member of its board of directors until his resignation in August 2008.

4. Defendant *James Brady* serves as the Chairperson of the Audit Committee, Chairperson of the Nominating and Corporate Governance Committee, and a member of the board. The board determined Brady to be an audit committee financial expert as defined by Item 407 of Regulation S–K and as required by NASDAQ Rule 4350(d).

motion to dismiss. *See In re Citigroup Inc. S'holder Deriv. Litig.,* 964 A.2d 106, 113, n. 3 (Del.Ch.2009).

5. Defendant *Paul Caine* was elected to the board of directors on September 5, 2007 and has since served there and as a member of the Audit Committee.

6. Defendant *Jack Dunn IV* served as a member of the board, as well as on the Compensation Committee and the Nominating and Corporate Governance Committee until his resignation in September 2008. Dunn is the Chairman, CEO and President of FTI Consulting, Inc., a firm that provided due diligence services to NexCen in connection with an acquisition and has been engaged for "review [of] the Company's cash flows and projections." Am. Comp. ¶ 87. Dunn is also a limited partner of the Baltimore Orioles and is a "lifelong friend" of Defendant Stamas. *Id.* at ¶ 88.

7. Defendant *Edward Mathias* serves as a member of the board and sits on the Audit Committee, Nominating and Corporate Governance Committee, and as Chairperson of the Compensation Committee.

8. Defendant *Jack Rovner* served as a member of the board and sat on the Compensation Committee until his resignation in August 2008.

9. Defendant *George Stamas* serves as a member of the board. Stamas is a senior partner at the law firm Kirkland & Ellis LLP and a director of FTI Consulting, Inc., both of which do business with NexCen. Stamas is also a limited partner in the Baltimore Orioles with defendant Dunn.

10. Defendant *Marvin Traub* served as a member of the board until his resignation in December 2008.

## B. Factual background

Plaintiff asserts that the relevant period for this suit begins on May 10, 2007.

In conjunction with her insider selling claim, plaintiff alleges sales made by defendants Oros and Dunn in May and June of 2007 were made while in possession of material undisclosed information. Dunn sold a total of 100,000 shares on May 16 and 17, 2007 with proceeds of $1,159,400. Oros allegedly sold a total of 164,783 shares in small batches on June 1, 4, and 5, 2007 with proceeds of $2,141,519.

In August 2007, NexCen issued a press release discussing a master loan agreement in place with BTMU Capital Corporation ("BTMU"), entered into on March 12, 2007, that allowed for borrowings up to $150 million. As of August 2007, the company had used $26.5 million to acquire The Athlete's Foot and $27.3 million to acquire Bill Blass, and was now drawing down $22 million for the acquisition of the Waverly brand. The following day, the company announced the acquisition of Pretzel Time and Pretzelmaker franchise concepts for the combined price of $29.4 million ($22.1 million in cash and NexCen common stock valued at $7.3 million). A few days later, the company announced the reporting of its second quarter 2007 results, and on September 7, 2007 a press release reported a further drawdown of $16 million to finance the intellectual property assets of the Pretzel Time and Pretzelmaker acquisitions.

On January 29, 2008, NexCen announced that it had acquired the Great American Cookie Company from Mrs. Fields Famous Brands, LLC for the purchase price of $93.7 million, consisting of approximately $89 million of cash as well as common stock valued at approximately $4.7 million. In the press release that announced the acquisition, the company stated that a portion of the purchase price was financed through the BTMU debt facility, which had been increased from $150 million to $181 million.

On March 14, 2008, the Company issued a press release entitled "NexCen Brands Reports 2007 Financial Results," which

stated that the company had "borrowed the full amount under our $180 million credit facility with BTMU Capital Corporation. We are exploring opportunities to convert this credit facility into a long-term, fixed-rate security."

On March 21, 2008, NexCen filed its 2007 Annual Report with the Securities and Exchange Commission ("SEC") on Form 10–K. This submission was signed by all of the individual defendants here. The 10–K provided, in relevant part:

> In connection with the financing of our acquisition of Great American Cookies on January 29, 2008, we increased the maximum amount of borrowing that may be outstanding at any one time from $150 million to $181 million and modified certain defined terms used in the original loan documentation and related documents to take into account the Company's acquisition of real estate assets in the Great American Cookies transaction. With the exception of these changes, the increase to the BTMU Credit Facility is substantially on the same terms as the original credit facility.

The 10–K then discussed the terms of the loan in some detail, but made no mention of any accelerated redemption clause. Further, the 10–K stated, "We anticipate that cash on hand and cash generated from operations will provide us with sufficient liquidity to meet the expenses of operations, including our debt service obligations, for at least the next twelve months."

However, the amended loan facility did include an accelerated redemption clause. Specifically, though the amendment to the credit facility allowed NexCen to borrow an additional $70 million to finance a portion of the acquisition purchase price of Great American Cookies, it also included an accelerated-redemption feature that required $35 million of the total $70 million be reduced to $5 million by October 17, 2008.

In addition, under the terms of the original agreement, the revenues earned by the franchise and brand management business were collected in lockbox accounts and disbursed on a periodic basis to cover NexCen's ordinary operating expenses. However, under the terms of the amendment, a portion of those disbursements were subordinated, limiting the amount of cash available to cover operating expenses. The amendment required that all remaining collected cash from the franchise businesses that was not necessary to cover operating expenses be used to reduce the principal of the $35 million accelerated redemption feature.

In May 2008, the omission of this information was disclosed by the company, resulting in the filing of a Current Report with the SEC on Form 8–K and the issuance of a press release outlining the omissions regarding the accelerated redemption feature, the fact of which would significantly change the amount cash available to the company.[2] The press release also announced that "the company believes that there is substantial doubt about its ability to continue as a going concern, and pending completion of an independent review discussed below, that this substantial doubt also may have ex-

---

**2.** The press release stated: "In the course of preparing its first quarter 2008 10–Q and following the appointment of its new Chief Financial Officer, the company conducted a review of its prior public filings, including the terms of the January 2008 amendments to its bank credit facility.... The company concluded that disclosures regarding the acceler-

ated-redemption feature of its bank credit facility, as well as other changes that reduced the amount of cash available to the company for general use, were not contained in the company's 2007 Annual Report on Form 10–K or the January 29, 2008 Current Report on Form 8–K filed in connection with the acquisition of Great American Cookies."

isted at the time the company filed its 2007 10–K." Further, the company announced that the Audit Committee had retained independent counsel to conduct a review and that its prior guidance for 2008 financial results was no longer valid.

When this information was released on May 19, 2008, shares fell 77.08% to $0.58 per share.

Over the next several months, a financial consultant hired by NexCen sought a solution to the cash flow problem and the internal investigation into the Company's inadequate disclosures continued. In a Form 8–K filed on August 19, 2008, the company stated the "key conclusions" of the independent counsel hired to conduct the investigation:

> Certain members of the Company's senior management (i) failed to advise the board of directors of material changes in the terms of the financing of the Great American Cookies acquisition after the board had approved terms previously presented to it and (ii) made serious errors with respect to public disclosures regarding the terms of the financing and their impact on the Company's financial condition that were contained in the [disclosures at issue]. Independent counsel did not find evidence that led it to conclude that there was an intentional effort to keep information concerning the terms of the financing from the board, the auditors or the public."

In conjunction with this report, the board determined that changes in management and in the responsibilities of the financial staff had sufficiently addressed the issues identified by independent counsel.

Subsequently, NexCen sold its Waverly and Bill Blass brands at a loss and had its common stock de-listed by the NASDAQ Stock Market, resulting in the suspension of trading on January 13, 2009. On August 11, 2009, the company filed its amended Form 10–K ("10–K/A") and restated

financials for the period ending December 31, 2007, which confirmed the omission of the change in the credit facility's terms and its effect on the company's cash flow. The 10–K/A further stated that "[w]e have concluded that there was substantial doubt about our ability to continue as a going concern as of December 31, 2007." We note that this is even prior announcement of the Great American Cookies acquisition.

Incorporated in these disclosures was the report of KPMG, which had been hired as an independent registered public accounting firm. KPMG cited material weaknesses in the company's system for financial controls including (1) the company's failure to maintain a sufficient number of accounting and financial reporting personnel; (2) the fact that the personnel retained did not have the appropriate level of expertise in generally accepted accounting principles ("GAAP"); (3) the lack of effectiveness in the design and implementation of the company's controls over the completeness and accuracy of accrued liabilities; and (4) the lack of sufficient clarity as to the roles and responsibility of senior management.

## C. The action here

Plaintiff brought her original complaint on June 27, 2008 and filed her amended complaint on August 25, 2009 after the filing of the 10–K/A. Plaintiff asserts claims derivatively on behalf of the company for breach of fiduciary duty, abuse of control, gross mismanagement, unjust enrichment, and insider selling. Plaintiff did not seek to bring this suit to the board for their approval in advance of filing, allegedly because making such a demand would have been futile, as discussed in greater detail below. Defendants now seek to have the suit dismissed for failure to make such a demand, arguing that the board would have been able to make a disinter-

ested and independent business judgment as to whether the company should bring the suit.

## DISCUSSION

■ Delaware courts have long held that "stockholder plaintiffs [in derivative suits] must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue [a] derivative claim." *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993). In keeping with this doctrine, plaintiffs asserting a claim on behalf of the corporation are required to either (1) demand of the directors that they pursue the corporation's claim and be wrongfully refused, or (2) establish that making such a demand would have been futile in that the directors "are deemed incapable of making an impartial decision regarding the pursuit of the litigation." *Wood v. Baum,* 953 A.2d 136, 140 (Del. 2008). This second prong involves an analysis into to whether such failure to make a demand is "excused." To adequately plead such a demand or excuse, plaintiffs must "state with particularity: (a) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (b) the reasons for not obtaining the action or not making the effort." Fed.R.Civ.P. 23.1(b)(3).

■ In analyzing whether the failure to make such a demand will be excused, the Court must look to the law of the state where the nominal defendant is incorporated. *Halpert Enterprises, Inc. v. Harrison,* 362 F.Supp.2d 426, 430 (S.D.N.Y.2005) ("The relevant substantive law on demands is that of the state where the corporation is incorporated.") (citation omitted); *see also Kamen v. Kemper Financial Ser-*

*vices, Inc.,* 500 U.S. 90, 108–09, n. 10, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (ordering application of Maryland law to substantive issue of whether demand was futile and leaving to the lower court question of whether pleadings were sufficient under Rule 23.1). Here, the parties agree that the substantive law of Delaware governs the question of whether plaintiff's failure to make a demand on NexCen's board of directors is excused.

■ Plaintiff alleges there that no demand was made to the NexCen board because any attempt to make such a demand would have been futile. In such circumstances, two tests are used to determine whether the failure to make demand is excused. The first, known as the *Aronson* test, is applied to claims where plaintiff alleges "a conscious business decision in breach of [the directors'] fiduciary duties." *Wood,* 953 A.2d at 140. It requires that the plaintiff "allege particularized facts creating a reason to doubt that '(1) the directors are disinterested and independent [or that] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'" *Id.* (citing *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984)). The second test is known as the *Rales* test, and applies "where the subject of a derivative suit is not a business decision of the board but rather a violation of the Board's oversight duties." *Id.* The parties do not dispute that *Rales* is the proper standard for analysis here.[3]

■ *Rales* requires that, in order to show that the demand requirement is excused, the plaintiff must set out particularized facts that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterest-

3. While plaintiff initially argued in her papers that *Aronson* should be applied, at oral argument plaintiff's counsel did not contest that *Rales* was the proper standard. Oral Argument ("Oral Arg.") at 14:16–17, June 25, 2010.

ed business judgment in responding to a demand." *Rales,* 634 A.2d at 934. The Court must thus determine whether a majority of the board was either "interested" or lacking in "independence" within the context of its ability to assess a demand. Here, plaintiff argues that demand should be excused because a majority of the defendants face a substantial likelihood of liability as a result of the filing of this action given the alleged magnitude of the internal control deficiencies and their fiduciary duties to maintain an adequate level of oversight on the corporation's internal controls.

## A. Relevant Board

While not explicit in the plaintiff's papers, there appears to be a dispute as to which present or former board members should be deemed to constitute the board for purposes of the demand excused analysis. Plaintiff's amended complaint names as defendants all of the directors that were on the board as of the filing of the original complaint, but only discusses the five defendants that were serving on the board at the time of the filing of the amended complaint when arguing that demand should be excused. Plaintiff does not discuss the justification for applying the arguments to this limited number of directors in her papers, offering no citation or argument as to the proper constitution of the board for purposes of this analysis. At oral argument, plaintiff offered only that "[t]here is a split of authority" on which board to look to, without offering cases or further argument. Oral Arg. at 25:22. In contrast, the defendant argued both at oral argument and in their papers that "[t]he filing of an amended complaint only . . . [changes the relevant board for analysis] to the extent that the amended complaint raises claims not already Validly in litiga-

tion.'" *In re Fuqua Industries, Inc. S'holder Litig.,* No. CIV.A. 11974, 1997 WL 257460, at *13 (Del. Ch. May 13, 1997) (unpublished) (citing *Harris v. Carter,* 582 A.2d 222, 230 (Del.Ch.1990)); Oral Arg. at 24–26. In *In re Fuqua Industries,* cited by defendants, the majority of the board was replaced between the time of the original and amended complaints, and all derivative claims were made in the original complaint. *Id.* The Court held that, because the derivative claims were included in the original complaint, the relevant board for analysis should be that in place at the time of the original filing. *Id.*

■ Plaintiff's amended complaint was brought following the filing of NexCen's 10–K/A and financial restatement, but it does not include any new causes of action.[4] At the filing of the original complaint, the board consisted of the nine board members named here as defendants. Upon the filing of the amended complaint, four of those members had resigned from the board. Though a majority of the original board was still in place, we believe the relevant board for analysis here should be the board as constituted at the time of the original complaint's filing, given that all of plaintiff's derivative claims were validly in litigation at that time. *See also In re Affiliated Computer Services, Inc. S'holders Litig.,* C.A. No. 2821–VCL, 2009 WL 296078, at *1 (Del.Ch. Feb. 6, 2009) (unpublished) (finding that because all derivative claims were made in the first amended complaint, arguments regarding the board members in place at the time of the first amended complaint would determine the demand excused analysis); *California Public Employees' Ret. System v. Coulter,* 2002 WL 31888343, at *6 (Del.Ch. Dec. 18, 2002) (unpublished) (finding the board constituted at the time of the original complaint to be the relevant board because no

---

**4.** The amended complaint dropped a cause of action for waste and removed defendant

Dunn's name from the cause of action for insider trading.

derivative claims were added in the amended complaint).

Accordingly, we will analyze whether the plaintiff has created a reasonable doubt that a majority of NexCen's board members, as the board was constituted at the filing of the original complaint, could have properly executed their independent and disinterested business judgment in response to a demand. These board members include all the individual defendants named in this action: defendants Oros, Brady, Caine, Mathias, Stamas, Rovner, Dunn, Traub, and D'Loren.

## B. Interest

Delaware courts have found that a director is "interested" in the context of the demand excused analysis when a director derives any personal financial benefit that does not accrue to the corporation or stockholders generally, or when a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. *See Rales*, 634 A.2d at 936.

Reasonable doubt as to the board's ability to exercise its business judgment can be established by alleging that the members of the board faced a substantial risk of personal liability as a result of the suit. However, "the mere threat of personal liability ... is insufficient to challenge either the independence or disinterestedness of directors." *Aronson*, 473 A.2d at 815; *see also Wood*, 953 A.2d at 141, n. 11; *Rales*, 634 A.2d at 936. Indeed, cases where such liability qualifies as an interest for the purpose of excusing demand occurs only "rare[ly]," "where defendants' actions were so egregious that a substantial likelihood of director liability exists." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del.Ch.1995) (citing *Aronson*, 473 A.2d at 815).

Further, "[w]here directors are contractually or otherwise exculpated from liability for certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts.'" *Wood*, 953 A.2d at 141 (citations omitted) (emphasis in original). Delaware law provides that "[s]uch a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty." *Stone v. Ritter*, 911 A.2d 362, 367 (Del.2006); *see also* Del.Code Ann. tit. 8, § 102(b)(7).[5]

The director defendants here are covered by such an exculpatory provision.[6] Thus, in order to face a substantial likeli-

---

5. By statute, a company may include in their certificate of incorporation: "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title [unlawful dividend or stock purchase]; or (iv) for any transaction from which the director derived an improper personal benefit." Del.Code Ann. tit. 8, § 102(b)(7).

6. NexCen's Charter provides: "A director of the Corporation shall under no circumstances have any personal liability to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; provided, however, that this provision shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit." Martin Decl. Ex. B at 3.

hood of liability here, plaintiff must allege with particularity that defendants failed to act in good faith or otherwise breached their duty of loyalty.[7] This burden has been described by the Delaware Supreme Court as follows:

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

*In re Walt Disney Co. Derivative Litigation,* 906 A.2d 27, 67 (Del.2006) (approving of the Chancery Court's characterization of "bad faith"). Further, where a defendant is exculpated in the absence of bad faith, the Delaware Supreme Court has required that plaintiff sufficiently allege actual or constructive knowledge of illegal behavior on the part of the defendants. *Wood,* 953 A.2d at 141 (citing *Malpiede v. Townson,* 780 A.2d 1075; *Emerald Partners v. Berlin,* 787 A.2d 85; *Desimone v. Barrows,* 924 A.2d 908, at 933–35 (Del.Ch.2007)).

Plaintiff argues three different grounds for finding that certain or all of the directors are interested. First, plaintiff argues that defendants Oros and Dunn traded while in the possession of material nonpublic information, thus accruing a personal financial benefit not common to the corporation generally. Further, plaintiff argues that all of the defendants are interested because they face a substantial likelihood of liability stemming from the later-retracted disclosures in NexCen's 2007 10–K Report. Plaintiff frames this likelihood of liability in the context of (1) the directors' signatures on the 10–K and (2) their alleged failure of oversight leading up to the disclosures. In making her argument regarding failure of oversight, plaintiff also alleges that defendants Brady, Caine, and Mathias face an even greater likelihood of liability based on their positions on NexCen's Audit Committee. We will address the insider trading allegations first, and then turn to the likelihood of liability in each of these contexts.

## 1. Insider Trading

 To show interest as a result of insider selling, plaintiff must plead "particularized facts regarding the directors ... [that] they engaged in material trading

**7.** Plaintiff argues that under Delaware law, a motion to dismiss may not be granted when a complaint includes duty of loyalty claims that aren't within the terms of the exculpation clause. In arguing this, however, the plaintiff misses the point. The issue currently before us does not require the Court to determine that all claims are exculpated to allow for dismissal. Instead, in the demand excused context, we must determine whether the non-exculpated, remaining duty of loyalty allegations amount to a "substantial likelihood of liability" such that the directors could not have made an impartial decision regarding plaintiff's demand. In the case cited principally by plaintiff, *Alidina v. Internet.com Corp.,* the claims there were discussed in the context of a 12(b)(6) motion and the court did not address whether demand was excused. 2002 WL 31584292, at *8, 2002 Del. Ch. LEXIS 156, at *28 (Del.Ch.2002). Thus the court's holding that a case may not be dismissed based on an exculpatory clause when there are breach of the duty of loyalty claims in addition to the exculpated duty of care claims is clearly distinguishable. *Id.* Other cases cited by plaintiff are similarly inapposite. *See Malpiede v. Townson,* 780 A.2d 1075, 1095 (Del.2001) (similar posture to *Alidina,* but the court found claim exculpated because complaint stated duty of care claim); *Emerald Partners v. Berlin,* 787 A.2d 85, 95 (Del.2001) (analyzing exculpatory clause in the context of an entire fairness analysis where defendant was on both sides of transaction).

activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition." *Guttman v. Huang*, 823 A.2d 492, 502 (Del.Ch.2003). Cursory allegations of insider trading are insufficient to establish such personal benefit to the director. *In re TASER Int'l S'holder Deriv. Litig.*, No. CV–05–123–PHX–SRB, 2006 WL 687033, at *9 (D.Ariz. 2006) (unpublished) (citing *Guttman*, 823 A.2d at 502). In the amended complaint, plaintiff alleges that defendants Oros and Dunn [8] made trades in May and June 2007, but offers no allegation regarding what material non-public information they might have been in possession of while trading. Plaintiff also offers no link between the trades and the later-in-time disclosures at issue here.[9] Thus, plaintiff has not alleged the particularized facts necessary to result in a finding of interest based on these trades.[10]

**2. Signatures on the 2007 10–K Form**

■ Plaintiff argues that each of the defendants face a substantial likelihood of liability because each signed the 2007 10–K. Without more, however, the signing of financial reports is insufficient to create an inference that the directors had actual or constructive notice of any illegality for purposes of the demand excused analysis. *Wood*, 953 A.2d at 142 (citing *Guttman*, 823 A.2d at 498 (dismissing complaint that was "devoid of any pleading regarding the full board's involvement in the preparation and approval of the company's financial statements" and of "particularized allegations of fact demonstrating that the outside directors had actual or constructive notice of the accounting improprieties.")); *see also Seminaris*, 662 A.2d at 1354 (rejecting plaintiff's contention that signatures on misleading submissions to the SEC were sufficient to establish a substantial likelihood of liability for conspiring to misrepresent the stock price).

The cases cited by plaintiff to justify such a likelihood of liability are not persuasive. Most of these cases are in the context of a Section 10(b) securities claim, which is not the context at issue before this Court.[11] Given that the controlling

---

8. Plaintiff includes allegations regarding Dunn's trading in the body of the complaint, but has removed Dunn's name from the Cause of Action for Insider Selling. Am. Comp. ¶¶ 58, 110–113. Regardless of this omission, we address and dismiss any such claim as to both directors

9. In making this argument, plaintiff points to personal stock sales allegedly made while in possession of material undisclosed information. Here, the allegedly insider trading by Oros occurred in May 2007 and that of Dunn in June 2007. The acquisition of Great American Cookies and the amendment to the loan facility that was used to finance it were not made until January 2008, and the 10–K that failed to disclose the accelerated redemption provision was not filed until March 21, 2008.

10. There is no allegation as to what material information these defendants possessed that compelled them to trade their shares at that time. Instead, plaintiff relies on a recitation

of the sales and the conclusory statement that the sales "were suspicious as to both the timing and amount in comparison to Defendants' historical NexCen trading activity." Am. Comp. ¶ 58. However, plaintiff provides no information as to NexCen's historical trading activity. Such allegations do not even approach what is necessary to plead that a defendant faces a substantial likelihood of liability for insider trading.

11. *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061–63 (9th Cir.2000) (finding defendant could potentially be a primary violator under § 10(b) because signature on false financial statements constituted making a statement within the meaning of § 10(b) and proceeding to analyze scienter); *In re Enron Corporation Securities, Derivative & ERISA Litigation*, 540 F.Supp.2d 800, 814, 829–30 (S.D.Texas 2007) (citing to *Howard* for potential officer liability where signed 10–Ks for purposes of § 10(b) liability and discussing in the context of a § 18 analysis); *In re Enron*

law here is Delaware state law, not federal securities law, we apply the holdings of the Delaware cases cited above that arise in the context of the analysis at issue here.

The one case cited by plaintiff that did arise in the context of the demand excused analysis is an unpublished Connecticut Superior Court case that is directly in conflict with *Seminaris*, a Delaware Chancery Court case cited above. *See Fina v. Calarco*, 2005 WL 3112894, at *6–7 (Conn.Super.2005) (unpublished) (citing conscious decision to sign off on 10–K to be potential for liability sufficient to justify a finding that the directors were interested). We find this case unpersuasive in light of the Delaware case law cited above.

 Here there is no allegation in the complaint that the board members knew of the improper disclosures when they signed the 2007 10–K. Plaintiff acknowledges that the internal investigation found that defendants did not have knowledge of the misstatement at issue, and does not offer any allegation that would indicate the contrary.[12] Accordingly, the signatures of the director defendants will not result in a finding of interestedness for purposes of the demand excused analysis.

### 3. Failure of oversight

By far the bulk of plaintiff's arguments, and the entirety of her presentation at oral argument, focused on an alleged failure of oversight stemming from the board's failure to sufficiently monitor the company's internal mechanisms for financial reporting. Plaintiff alleges that the defendants face a substantial likelihood of liability because they: (1) failed to adhere to the NexCen Corporate Guidelines regarding their oversight role; (2) failed to diligently evaluate information provided; (3) failed to ensure that reasonable reporting systems were in place; and (4) failed to ensure that reliable financial controls were in place and functioning to prevent improper reporting. In making this last allegation, plaintiff argues that NexCen's admissions in its Form 10–K/A,[13] filed August 11, 2009, constitute an admission that the board failed to ensure the functioning of reliable financial controls.[14]

 As plaintiff's allegations based on the Corporate Guidelines [15] and the failure

---

*Corp. Securities, Derivative & ERISA Litigation*, 258 F.Supp.2d 576, 587 (S.D.Tex.2003) (citing *Howard* and collecting other cases for the proposition that signing a 10–K constitutes making a statement under § 10(b)).

12. As cited in the amended complaint, the report stated: "Certain members of the Company's senior management (i) failed to advise the board of directors of material changes in the terms of the financing of the Great American Cookies acquisition after the board had approved terms previously presented to it and (ii) made serious errors with respect to public disclosures regarding the terms of the financing and their impact on the Company's financial condition that were contained in the Company's Current Report on Form 8–K filed with the SEC on January 29, 2008 and in the Company's Annual Report on Form 10–K.... Independent counsel did not find evidence that led it to conclude that there was an intentional effort to keep information concerning the terms of the financing from the

board, the auditors, or the public." Am. Comp. ¶ 45.

13. Specifically, plaintiff cites the admission that material weaknesses in internal controls became apparent as a result of the internal investigation, a finding which will be discussed in greater detail below.

14. Plaintiff cites to *Kohls v. Duthie* for this proposition. 791 A.2d 772, 782–83 (Del.Ch. 2000). However, *Kohls* holds only that the complaint there (a "highly unusual set of facts") stated a claim that, as plaintiffs argued, "no properly motivated director could have perceived [the] corporate opportunity and not thoroughly inquired into the company's ability to exploit it." *Id.*

15. Plaintiff's reliance on NexCen's Corporate Guidelines as demonstrative of appropriate standards for action fails because, "[a]lthough the members of the ... Committee were

to evaluate information [16] clearly fail, we will turn to plaintiff's allegation that the defendants demonstrated a "sustained and systematic failure to fulfill their fiduciary duties" that included bad faith, gross negligence and extreme recklessness.[17] Am. Comp. ¶ 89(b). This assertion invokes language the Delaware courts have frequently employed to assess allegations regarding a board's failure to ensure that sufficient systems for reporting and financial controls were in place.

### a) The standard first announced by the Delaware Supreme Court in *In re Caremark* provides the governing law on this claim.

In *In re Caremark Int'l Deriv. Litig.*, the Delaware Court of Chancery ruled that:

> Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activ-

charged with reviewing and ensuring the accuracy of [the company's] financial statements under the . . . charter, director liability is not measured by the aspirational standard established by the internal documents detailing a company's oversight system . . . to establish liability for misstatements when the board is not seeking shareholder action, shareholder plaintiffs must show that the misstatement was made knowingly or in bad faith." *In re Citigroup*, 964 A.2d at 135. Also, "[a]s the Supreme Court observed in *Brehm*, demand futility allegations cannot be based on deviations from 'aspirational goals of ideal corporate governance practices.' " *In re Dow Chemical Co. Deriv. Litig.*, C.A. No. 4349–CC, 2010 WL 66769, at *9 n. 50 (Del. Ch. Jan. 11, 2010) (citing *Brehm v. Eisner*, 746 A.2d 244, 256 (Del.2000)). Accordingly, though plaintiff made much of these guidelines in their briefing and before the Court, this argument must fail.

**16.** Though plaintiff argues that the board failed to sufficiently analyze the information underlying NexCen's disclosures, the amended complaint makes no allegation of any specific information that was provided to the board that was not sufficiently analyzed or was consciously disregarded. Rather, plain-

ities within the corporation . . . only a sustained and systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.

698 A.2d 959, 971 (Del.Ch.1996). The Delaware Supreme Court defined such bad faith in *In re Walt Disney Co. Deriv. Litig.* As "requir[ing] conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." 906 A.2d 27 (Del.2006). The Delaware Supreme Court has since affirmed these standards in its decision in *Stone v. Ritter*, 911 A.2d at 367–70.

The *Stone* Court held that, based on *Caremark*:

tiff stakes her claim on the allegation that the board should have done more to seek out and investigate the documentation underlying whatever it was that they might have been given. This is a very broad allegation, and noticeably lacks any suggestion that the members of the board were provided with any information regarding the changes to the loan provisions prior to the filing of the 10–K.

**17.** In the same paragraph cited here, the amended complaint also states that the directors "participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise same." To the extent this statement was intended to make an allegation beyond a failure of oversight claim, it is conclusory and will not satisfy any variant of the pleading requirements. As discussed above, plaintiff makes no specific allegations of knowledge of unlawful action on the part of the NexCen officers or directors or of any specific actions taken in an attempt to conceal any illegality. To the contrary, plaintiff acknowledges that the board initiated independent investigations when the misstatements came to light in May 2008.

"[N]ecessary conditions predicate for director oversight liability" are that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."

*Id.* at 370 (emphasis in original). "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Id.* Such a finding of bad faith requires a showing of scienter, or that defendants had actual or constructive knowledge of failure to act as the law requires. *Wood,* 953 A.2d at 141 (citations omitted); *see also In re Citigroup,* 964 A.2d at 125 (plaintiff can show bad faith by alleging director "*consciously* disregarded an obligation to be reasonably informed about the business and its risks or *consciously* disregarded the duty to monitor and oversee the business" (emphasis in original)).

> As the court in *Stone* highlighted,
> [T]he directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both. . . . In the absence of red flags, good faith in the context of oversight must be measured by the directors' actions 'to assure a reasonable information and reporting system exists' and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome.

*Id.* at 373 (citing *In re Caremark,* 698 A.2d at 967–68, 971). The failure of oversight

theory of liability is the "most difficult . . . in corporation law upon which a plaintiff might hope to win a judgment." *Stone,* 911 A.2d at 372 (quoting *In re Caremark,* 698 A.2d at 967).

 In sum, it is only if plaintiff can plead particularized facts that show a non-exculpated breach of loyalty for failure to act in good faith that she can demonstrate a likelihood of liability such that the failure to make a demand is excused. Thus, the essential question is whether the director defendants utterly failed to implement a system for reporting or financial control; or, having implemented such a system of controls, whether they consciously failed to monitor or oversee its operation.

**b)** **The actions or inaction of the NexCen board did not constitute a conscious disregard of their duty of oversight.**

While, not surprisingly, plaintiff does not set out the systems in place at NexCen prior to the filing of the 10–K/A; it appears from the citations to the 10–K and 10–K/A in the amended complaint that such a system existed, albeit to poor effect. In her submissions plaintiff argues both that defendants utterly failed to implement such a system and that they failed to monitor the system in place. However, at oral argument, plaintiff's counsel rightly focused on the failure to monitor argument. We also focus on the second prong of the *Caremark* analysis, given that NexCen did have some system in place for financial reporting.

 There is no dispute that NexCen's systems for financial control and reporting were deficient at the time of the faulty disclosure. After the company brought the omission to public light, the internal investigation reported the deficiencies, and NexCen included this information in its subsequent Form 10–K/A.[18] While plaintiff

---

**18.** Material weaknesses identified in the 10–K/A included: (1) dispersed oversight of legal

issues given the lack of a general counsel; (2)

quotes extensively from these findings in the amended complaint, the amended complaint lacks any allegation that such deficiencies were the product of a *conscious* disregard by the board of their duty to ensure that a reasonable reporting system was in place.[19]

1) **Plaintiff makes no allegation of knowledge or any mechanism by which the defendants would have been aware of the deficiencies at NexCen prior to the disclosure.**

In place of particularized allegations of consciousness, plaintiff offers general statements or relies on inferences that are not supported by specific allegations. For example, plaintiff states that the directors acted with bad faith in signing the 2007 10–K in that they "either knew of, or recklessly disregarded, the false statements and misrepresentations made in the Company's 2007 10–K, thereby becoming an accessory to the false statements and misrepresentations." Am. Comp. ¶ 71. In making this statement, however, there is no allegation about the mechanism by which the knowledge required under the bad faith inquiry would be obtained by the board. Further, allegations that "[t]he Director Defendants either evaluated [ ("information regarding the Company's business opportunities and credit facilities") ],

and intentionally or recklessly, rubber-stamped NexCen's misrepresentations or recklessly failed to ensure information necessary to prevent the misrepresentations was provided to them," *id.* at ¶ 68, does little to indicate that the board was presented with any information that would suggest that the disclosure system was malfunctioning or that the loan agreement's terms were amended, resulting in inaccurate disclosures. Absent more particularized pleadings as to the conscious disregard, these allegations cannot meet plaintiff's burden of particularized pleading with respect to the demand excused standard.

At oral argument, plaintiff argued that these general statements are sufficient to demonstrate a substantial likelihood of liability because the board members had a duty to make themselves aware of the deficiencies of the disclosure system and the information regarding the changes to the loan agreement. When pressed, however, plaintiff could not define the line that needed to be drawn between what information the directors had to request and review, and what information or documents they could rely on others to report the relevant details of.

The cases cited by plaintiff do not address this line-drawing concern or otherwise persuade us that the improper disclo-

---

"diffused management structure that lacked sufficient clarity as to the roles and responsibilities of senior management" that resulted in the failure to share information regarding the changes in the loan agreement across corporate functions or with the board; (3) dual lines of responsibility for financial management; (4) the lack of sufficiently detailed written policies and training regarding submissions to the SEC; and (5) the failure to maintain a sufficient number of accounting and financial reporting personnel or personnel with an appropriate level of technical expertise in GAAP. *See* Am. Comp. ¶ 54.

19. We also note that the mere fact that an investigatory committee found that there were

deficiencies in reporting does not necessarily result in a finding of a failure of oversight. In *Stone v. Ritter,* the Delaware Supreme Court refused to excuse demand despite the fact that (1) the Federal Reserve and the Alabama Banking Department had issued a Cease and Desist Order requiring the company at issue to improve its compliance program and to engage an independent consultant to conduct a review of the program; and (2) FinCEN had issued a written Assessment of Civil Money Penalty including detailed "determinations" regarding the compliance procedures. *Stone,* 911 A.2d at 366.

sure was a result of a conscious disregard by the directors. *See In re TASER*, 2006 WL 687033 (court did not make explicit factual findings as to conscious disregard but listed plaintiff's arguments and found totality of circumstance, including the sale of as much of 100% of stock holdings by many of the directors to constitute justification for excusing demand); *In re Emerging Communications, Inc. S'holders Litig.*, No. Civ. A. 16415, 2004 WL 1305745 (Del. Ch. Jun. 4, 2004) (unpublished) (after majority of opinion deals with valuation of the transaction, only discussion of director independence comes in the context of a fairness review of the transaction applying a different standard than that at issue here).

Cited especially strenuously by plaintiff's counsel at oral argument, the Sixth Circuit's opinions in *McCall v. Scott*[20] are similarly unpersuasive here. 239 F.3d 808 (6th Cir.2001), *amended* 250 F.3d 997. In that case, plaintiffs alleged that senior management, with board knowledge, devised schemes to improperly increase revenue and profits by engaging in various forms of Medicare and Medicaid fraud. The Court excused demand on plaintiffs' claim regarding the failure of the board to act because they found that plaintiffs had met their burden of pleading conscious disregard of known risks where plaintiffs had argued that the directors' actions were more than simply "sustained inattention," but rather constituted " 'intentional ignorance of' and 'willful blindness' to 'red flags' signaling fraudulent practices" at the company. *McCall*, 250 F.3d at 1001. Assessing the factual circumstances as a whole, the Court found

that a majority of the board were interested where, for example, (1) the Audit Committee was alleged to have reviewed reports clearly indicative of discrepancies in reporting, improper fees, and accounting improprieties; (2) several directors had been involved in illegal acquisition activities; (3) the 10–K had disclosed a *qui tam* action that should have alerted the board to improper business transactions; and (4) the magnitude and duration of the alleged wrongdoing was great. *McCall*, 239 F.3d at 820–824,

These allegations are in stark contrast to the pleadings at issue here, which do *not* allege (1) any specific mechanism by which the Audit Committee or the board were made aware of the change in the loan facility or that the financial controls were otherwise deficient; (2) that the board members were involved in negotiating the change in the facility; and (3) that there were any lawsuits in play. Further, while the loan provision certainly had meaningful ramifications for the company, there is no particularized allegation of a longstanding or widespread fraud at NexCen. In short, there are simply no red flags alleged in plaintiff's complaint here, and as a result, *McCall v. Scott* is not persuasive support for plaintiff's arguments.

▮ Absent any indication that the board was aware that the terms of the loan agreement had changed, that the disclosures were inaccurate, or that the systems were deficient, we do not see how the board members can be charged with a conscious disregard of their duties.

---

**20.** The *McCall* Court issued two opinions on this issue. The first, issued on Feb. 13, 2001, included the bulk of the factual and legal findings. 239 F.3d 808. The second, issued on Apr. 23, 2001 in response to petitions for rehearing or in the alternative for certification of questions of law, amended the Court's prior opinion by replacing the section discussing the intersection of the duty of care with the duty of loyalty and the duty of good faith. 250 F.3d 997.

**2) Audit Committee membership alone does not allow an inference of knowledge for purposes of determining whether a substantial likelihood of liability exists.**

 Plaintiff makes the additional argument that the members of the Audit Committee face a more substantial likelihood of liability given their roles on that committee, and that such a role is a sufficient basis upon which to infer knowledge of the alleged illegality. However, Delaware case law does not support that position. *Wood,* 953 A.2d at 142–43 (calling rule that membership [in the Audit Committee] alone is insufficient "well-settled Delaware law").[21] No allegation of specific knowledge is made regarding these defendants, and plaintiff relies solely on the fact of their membership in the Audit Committee to support an inference of knowledge of illegality. Consistent with the controlling Delaware law, we find that these defendants do not face a substantial likelihood of liability merely because they serve on such a committee. *See also In re Pfizer, Inc. Deriv. Sec. Litig.,* 307 Fed.Appx. 590, 594 (2d Cir.2009) (finding that Audit Committee membership did not warrant a presumption of knowledge of studies revealing misleading financial statements, and that, "[i]nsofar as the[ ] assertions relate to the defendants' failure to monitor the financial books and records of the company, they would appear to be claims of breaches of the duty of care"). The other cases cited by plaintiff do not persuade us otherwise.[22]

**3) Though plaintiff does not make interestedness arguments with respect to individual directors, D'Loren could possibly be interested.**

No argument is made with respect to the disinterestedness of individual directors aside from that discussed above. Though plaintiff does not include any arguments regarding defendant D' Loren's interestedness, as the President and CEO at the time of the acquisition and financing, we note that arguments could be made. For the purposes of this analysis we will assume without deciding that a finding of

21. Further, plaintiff alleges that the Court is entitled to infer that the "knowledge of the Audit Committee members can be imputed to the entire Board." Pl. Mem. at 14. However, the sole case cited for this proposition is inapposite. *See Saito v. McCall,* No. Civ. A. 17132-NC, 2004 WL 3029876 (unpublished) (Del.Ch. Dec. 20, 2004). There, the committee had been informed of accounting problems by its auditor. In discussing whether demand was excused, the court, in a footnote, wrote that a "committee of the board, acting in good faith, would have openly communicated with each other concerning the accounting problems ... and would have shared the information with the entire ... board." *Id.* at *8, n. 71. This is hardly the situation here. Further, the Delaware courts have specifically declined opportunities to extend the ruling in *Saito. See Desimone v. Barrows,* 924 A.2d at 943 (finding that "*Saito* did not lay down any universally applicable rule about knowledge imputation" and that, where there is no allegation that the wrongful conduct was discussed with board members, there is no imputation).

22. Plaintiff cites several cases placing importance on membership in the Audit Committee; however these cases are not directly on point. *See In re TASER,* 2006 WL 687033, at *10 (finding demand excused and citing plaintiff's argument that membership in the Audit Committee allowed inference that members must have known of declining sales trend when approving earnings press releases that did not account for the trend where the members also sold 100% of their stock holdings); *In re Emerging Communications, Inc. S'holders Litig.,* 2004 WL 1305745, at *39–40 (finding that where a defendant with special accounting expertise "had strong reasons to believe" that the price of a transaction with a director was too low and thus unfair to the corporation, it was incumbent upon him to act to disclose that information).

interest could be made with respect to defendant D'Loren and proceed to a determination of the directors' independence, though we make it clear that in proceeding this way we make no finding as to any knowledge or specific action of defendant D'Loren, a clarification which is appropriate given that no such allegations have been made.

## C. Independence

▐▐▐▐ To the extent that some or all of the directors are found to be interested,[23] the Court must determine "whether any of the other members of the board are compromised in their ability to act independently of the directors found to be interested." *Guttman,* 823 A.2d at 501–02. Even if a specific director is found to be disinterested, "his discretion must also be free from the influence of other interested persons." *Seminaris,* 662 A.2d at 1354 (citing *Rales,* 634 A.2d at 936). "A director is independent if he can base his decision 'on the corporate merits of the subject before the board rather than extraneous considerations or influences.'" *Id.* (quoting *Aronson,* 473 A.2d at 816).

Given our findings above, defendant D'Loren is the only even potentially interested director. Though plaintiff makes certain allegations regarding the lack of independence of defendants Oros, Stamas, and Dunn, even if we were to find that all of these defendants were lacking independence, the majority of the board would still be disinterested and independent.

For the sake of completeness and the benefit of any reviewing court, we will address plaintiff's assertions, but what follows is in no way meant to lend credence to plaintiff's arguments in this regard.

## 1. Defendant Oros

▐▐▐▐ Plaintiff argues that defendant Oros lacks independence because his principal source of income is derived from the company. However, "[m]ere allegations of substantial compensation are insufficient to establish futility" without an allegation of unreasonableness. *In re Evergreen Mut. Funds Fee Litig.,* 423 F.Supp.2d 249, 263 (S.D.N.Y.2006) (internal quotation omitted). However, "[t]here may be a reasonable doubt about a director's independence if his or her continued employment and compensation can be affected by the directors who received the challenged benefit." *MCG Capital Corp. v. Maginn,* CA No. 4521–CC, 2010 WL 1782271, at *20 (Del.Ch. May 05, 2010) (unpublished) (citing *Rales,* 634 A.2d at 937; *Kahn v. Tremont,* Civ. A. No. 12339, 1994 WL 162613, at *2 (Del.Ch. Apr. 21, 1994)). "For director compensation to create independence problems, however, it must be shown that the compensation is material to the director." *Id.* (citing *Orman v. Cullman,* 794 A.2d 5, 25 n. 50 (Del.Ch.2002)). There is no allegation that defendant Oros' compensation could have been affected by D'Loren at the time of the original complaint's filing or that such compensation was unreasonable. Further, while plaintiff does allege that Oros' compensation was his principal source of income, it is not otherwise alleged that such compensation was material to him. Regardless, even if defendant Oros was lacking in independence, only two of the directors would be interested or lacking in independence,

---

**23.** A court must consider whether directors were independent only upon a finding that one or more of the directors is not disinterested. *See Brehm,* 746 A.2d at 258 (finding determination that alleged controller was disinterested to obviate need for assessing independence); *see also Rales,* 634 A.2d at 936 ("Having determined that [three directors] would be interested in a decision on [the] demand, we must now examine whether the remaining . . . directors are sufficiently independent").

which is insufficient to constitute the majority required for demand futility.

## 2. Defendant Stamas

█ Plaintiff next argues that Defendant Stamas lacks independence based on his outside business connections with NexCen. According to the amended complaint, Stamas' business connections include his position as a partner at Kirkland & Ellis, a law firm that does work for NexCen and has outstanding bills owed by NexCen; as well as his position on the board of FTI Consulting, which has done due diligence work for NexCen in the past and was more recently hired to do cash flow analysis for the company. Without more, however, Stamas' positions with Kirkland & Ellis and FTI Consulting are not sufficient to establish a lack of independence. *See, e.g. Halpert Enterprises,* 362 F.Supp.2d at 433 (membership on other boards does not call into question independence, and receipt of fees is similarly unavailing if "there are no particularized allegations indicating that that compensation is excessive") (citations omitted). Also, as with Oros' compensation, there is no allegation that any fees outstanding or business relationships would have been threatened had Stamas acceded to a demand.

## 3. Defendant Dunn

█ Plaintiff further argues that Defendant Dunn is not independent of Defendant Stamas because of their longstanding personal and business relationships involving their board membership at FTI Consulting and the fact that they both hold ownership interests in the Baltimore Orioles. This argument is similarly unpersuasive.[24]

While, as stated above, there are multiple problems on the merits with plaintiff's arguments regarding the independence of Stamas and Dunn, it is also significant issue that none of plaintiff's arguments relate to a lack of independence from defendant D'Loren, the only director that we have found interested here.

None of these arguments warrant a finding that any of the defendants lacked the ability to make an independent judgment on the corporate merits of the decision regarding bringing suit here. We thus find that the majority of the NexCen board would have been able to exercise its disinterest and independent business judgment in responding to the demand. *See Rales,* 634 A.2d at 934.

## CONCLUSION

█ Because plaintiff has not established a reason to doubt a majority of the board's disinterest or independence at the time the initial complaint was filed, we dismiss this action for failure to make a demand on the board of directors prior to suit. Plaintiff's request that we excuse demand would necessitate the finding of a substantial likelihood of liability based on the failure to ask a question: whether the loan facility, already in place for some

**24.** Mere personal or business relationships will not raise a reasonable inference that a director cannot consider demand, absent specific factual allegations to support such a conclusion. *Beam v. Stewart,* 845 A.2d 1040, 1050 (Del.2004); *see also Robotti & Co., LLC v. Liddell,* C.A. No. 3128–VCN, 2010 WL 157474, at *12 (Del.Ch.2010); *Kohls v. Duthie,* 765 A.2d 1274, 1284 (Del.Ch.2000) (personal and/or business relationships insufficient to show lack of independence). In *Beam,* the Supreme Court required that a relationship between the disinterested director and the interested director be so close that one could infer that "the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." *Beam,* 845 A.2d at 1050. Plaintiff has offered no particularized allegation in this regard beyond the mere fact of a preexisting relationship between defendants Stamas and Dunn.

time, had materially changed given the specific acquisition. It is not clear that the directors had a reason to ask such a question or request any pertinent documentation, given that (1) the financial documents submitted for their signature stated that there were no such changes and (2) there were no alleged "red flags." Given that "a failure to act in good faith requires conduct that is qualitatively different from, and more culpable than ... gross negligence," *Stone*, 911 A.2d at 369, defendants' conduct does not demonstrate a conscious disregard of their duty to exercise oversight or otherwise generate a substantial likelihood of liability in this action. Accordingly, we dismiss the amended complaint for failure to make a pre-suit demand on the board of directors.

**SO ORDERED.**