Filed 9/17/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CHARTER TOWNSHIP OF CLINTON POLICE AND FIRE RETIREMENT SYSTEM et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CRAIG L. MARTIN et al., <br><br> Defendants and Respondents. | B241087 <br><br> (Los Angeles County Super. Ct. No. BC454543) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kenneth R. Freeman, Judge.  Affirmed.

Robbins Geller Rudman & Dowd, Travis E. Downs III, Kevin K. Green and Amanda M. Frame for Plaintiff and Appellant Charter Township of Clinton Police and Fire Retirement System.

The Weiser Law Firm and Kathleen A. Herkenhoff for Plaintiff and Appellant Colleen Witmer.

Robbins Umeda, Brian J. Robbins and Shane P. Sanders for Plaintiff and Appellant Daniel Himmel.

Paul Hastings, William F. Sullivan, D. Scott Carlton; Wachtell, Lipton, Rosen & Katz, Warren R. Stern and Kim B. Goldberg for Defendants and Respondents Craig L.

Martin, Noel G. Watson, Joseph R. Bronson, John F. Coyne, Robert C. Davidson, Jr., Edward Fritzky, John P. Jumper, Linda Fayne Levinson, Benjamin F. Montoya, Thomas M.T. Niles, Peter J. Robertson, John W. Prosser, Jr., Thomas R. Hammond, George A. Kunberger, Gregory J. Landry, and Frederic W. Cook & Co., Inc.

Gibson, Dunn & Crutcher, Joel A. Feuer; and Michael M. Farhang for Nominal Defendant and Respondent Jacobs Engineering Group Inc.

_____

Three plaintiffs[1] filed the operative consolidated amended shareholder derivative complaint on behalf of nominal party Jacobs Engineering Group, Inc., against multiple defendants, including the individual members of Jacobs's Board of Directors (the Board),[2] senior Jacobs's executives[3] covered by a May 2010 executive compensation plan adopted by the Board, and Frederic W. Cook & Co., Inc., a consultant to Jacobs on the creation of the compensation plan. The consolidated complaint alleged the Board members violated fiduciary duties by adopting the compensation plan in the face of poor performance by Jacobs, misrepresenting compliance with the plan and company performance in a proxy statement, and failure to alter the plan in response to its rejection by a majority of Jacobs's shareholders in a nonbinding vote. Plaintiffs alleged it was "useless and futile" to file a pre-suit demand on the Board to rescind the plan.

---

[1] Plaintiffs and appellants are Colleen Witmer, Charter Township of Clinton Police and Fire Retirement System, and Daniel Himmel.

[2] The Board consists of Craig L. Martin, Noel G. Watson, Joseph R. Bronson, John F. Coyne, Robert C. Davidson Jr., Edward Fritzky, John P. Jumper, Linda Fayne Levinson, Benjamin F. Montoya, Thomas M.T. Niles, and Peter J. Robertson.

[3] The executives named in the lawsuit are defendants Craig L. Martin, John W. Prosser Jr., Thomas R. Hammond, George A. Kunberger, and Gregory J. Landry.

2

The trial court sustained defendants' demurrer to the consolidated complaint on the grounds that plaintiffs had failed to adequately plead pre-suit demand futility, and alternatively, the complaint failed to state a cause of action under applicable California and Delaware law. Plaintiffs challenge both aspects of the court's order sustaining the demurrer. We agree with the trial court that plaintiffs have failed to allege facts excusing pre-suit demand on the Board with allegations of particularized facts showing wrongdoing by a majority of directors on a director-by-director basis. In reaching this conclusion, we agree with and cite in detail from the recent opinion in *Raul v. Rynd* (D. Del., Mar. 14, 2013, C.A. No. 11-560-LPS) U.S. Dist. LEXIS 35256 (*Rynd*), which dismissed a complaint containing allegations strikingly similar to those against defendants in this case for failure to allege pre-suit demand futility. Accordingly, we affirm and need not reach the issue of whether plaintiffs have alleged facts sufficient to state a cause of action.

## BACKGROUND

### A. The Operative Complaint

Plaintiffs filed the operative consolidated complaint in December 2011, described as "a failed 'say-on-pay'" derivative shareholder action against defendants. The complaint alleged three causes of action against the individual defendants for breach of fiduciary duty based upon institution of the 2010 executive compensation program (first cause of action), false and misleading statements by the Board claiming it had adhered to Jacobs's "pay for performance" policy (second cause of action), and false and misleading statements comparing Jacobs's performance to its "peer group" (third cause of action). Plaintiffs alleged causes of action against Cook for aiding and abetting breaches of fiduciary duties (fourth cause of action) and breach of contract (fifth causes of action).

The pertinent factual allegations of the operative complaint can be summarized as follows. In May 2010, the Board adopted a pay-for-performance compensation policy

3

designed to promote a performance-based culture and align the interests of Jacobs's executives with those of shareholders by linking compensation to the corporation's performance.  Contrary to the stated policy, the Board increased executive pay by substantial amounts, even though Jacobs was experiencing a weak financial performance in 2010, including a revenue shortfall of more than $1.5 billion.

The Board filed a Proxy Statement (Proxy) with the United States Securities and Exchange Commission (SEC), which was disseminated to Jacobs's shareholders on December 17, 2010, unanimously recommending approval of the compensation package approved in May 2010.  A shareholder's vote on executive compensation under the provisions of the Dodd-Frank Act is nonbinding.[4]  The Proxy described Jacobs's philosophy of awarding compensation based on superior performance and providing consequences for poor performance.

The May 2010 compensation package increased compensation to executives Martin, Prosser, Hammond, Kunberger, and Landry by 27.5, 19.3, 10.3, 16.3, and 18.6

---

[4]  "The Dodd-Frank Wall Street Reform and Consumer Protection Act, *see* 15 U.S.C. § 78n-1 ('Dodd-Frank'), was enacted on July 21, 2010.  [Citation.]  Section 951 of Dodd-Frank requires that publicly-traded companies include a resolution in their proxy statements asking shareholders to approve, in a non-binding, 'say-on-pay' shareholder vote, the compensation of their executive officers.  [Citations.]  A separate resolution is required to determine whether this shareholder say-on-pay vote should occur every one, two, or three years.  (*See* [citation]; 15 U.S.C. § 78n-1.)

"Dodd-Frank explicitly provides that say-on-pay votes 'shall not be binding on a company or its board of directors, and 'may not be construed' in any of the following ways:  (1)  'as overruling a decision' by the company or its board of directors; (2)  'to create or imply any change to the fiduciary duties' of the company or its board of directors; (3)  'to create or imply any additional fiduciary duties' for the company or its board of directors;' or (4)  'to restrict or limit the ability of shareholders to make proposals for inclusion in proxy materials related to executive compensation.'  15 U.S.C. § 78n-1(c)."  (*Rynd*, *supra*, U.S. Dist. LEXIS at pp. *6-7.)

4

percent, respectively.[5] Combined compensation for these executives increased from approximately $13.5 million in 2009 to almost $17 million dollars in 2010. The increased executive compensation neither rewarded superior performance nor recognized the consequences for poor performance, contrary to the Board's stated policy, casting doubt upon the Board's loyalty and business judgment.

The Board justified its recommendation in the Proxy by greatly overstating Jacobs' performance compared to self-selected peer companies. The Board misrepresented that: Jacobs's financial performance for the last fiscal year was above the median in growth of its peers, when the company ranked below 90 percent of those companies for fiscal 2010; Jacobs's performance for the last fiscal year was in the median range for net income growth compared to the industry peer group, although net income decline for fiscal 2010 was so large ($153 million) that Jacobs ranked below at least 80 percent of its own self-selected peers; Jacobs's fiscal 2010 return on average shareholders' equity of 8.97 percent was in the median range for its self-selected peer group, but Jacobs's results for fiscal 2010 were well below the numbers for 9 out of 11 self-selected peers and the median 12-month return of equity for Jacobs's peers was actually over 30 percent higher than that of Jacobs as of September 30, 2010; and Jacobs's financial performance for the 2010 fiscal year was above the median of its peer group in return on invested capital, although the one and two-year return on invested capital ranked below at least 63 percent of the members of its peer group.

Institutional Shareholder Services, Inc., (ISS) issued a recommendation advising Jacobs's shareholders to vote against the Board-recommended executive compensation proposal. Contrary to other companies when confronted with an ISS report recommending a no vote in advance of a shareholder "say-or-pay" vote, Jacobs refused to modify the executive compensation. On January 27, 2011, 55.2 percent of Jacobs's shareholders voted against the Board's 2010 executive compensation program.

---

[5] Only one member of the eleven-member Board, Martin, is a member of management who received the challenged compensation.

Plaintiffs alleged Cook is an executive compensation advisory firm that assisted the Board in its evaluation of the May 2010 executive compensation plan. According to the Proxy, Cook reviewed and made recommendations concerning all of the components of Jacobs's executive compensation program. The 2010 Proxy stated that Cook "serves as an objective, third party counsel on the reasonableness of compensation levels in comparison with those of other similarly situated companies, and the appropriateness of [Jacobs's] compensation program structure."

The operative complaint contained identical allegations against the 11 Jacobs's directors, with the exception of Martin, who as president and chief executive officer of Jacobs benefited from the May 2010 compensation plan. As to each director, the operative complaint alleged (1) the amount of time the director had served on the Board, and (2) that the director "issued the 2010 Proxy representing that Jacobs's executive compensation practices follow a pay-for-performance policy, and that [Jacobs] performed well for 2010 when compared to its own self-selected peers in terms of revenue growth, net income growth, [return on equity], and [return on invested capital], when clearly it did not. [He or she] also signed Jacobs's 2010 Form 10-K containing Jacobs's diminished 2010 results."

As to the failure to make a pre-suit complaint to the Board, the complaint alleged a "pre-suit demand upon the Board is a useless and futile action" because "[t]here is doubt that the Board's decision to increase 2010 executive compensation was a protected business judgment, which excuses demand" and "[a] majority of the Board was interested in a demand because there is a substantial likelihood that they will be held liable for their conduct" in failing to fulfill their fiduciary duties of loyalty and good faith, including making the allegedly false and misleading statements.

6

**B. The Proxy Filed with the SEC**

    **1.** *The December Proxy*

    The December 2010 Proxy included materials relevant to an advisory vote on executive compensation as required by Dodd-Frank. The Board unanimously recommended a "yes" vote on the May 2010 executive compensation plan.

    "Consistent with [Jacobs's] compensation philosophy, our executive compensation program has been designed to promote a performance-based culture and align the interests of executives with those of shareholders by linking a substantial portion of compensation to [Jacobs's] performance. The program is designed to award superior performance and provide consequences for underperformance. The program is also designed to attract and to retain highly-qualified executives who are critical to the success of [Jacobs]."

    To accomplish these goals, "[Jacobs] provides pay that is highly leveraged toward equity in order to align total compensation with shareholder interests." Demonstrating that the majority component of executive compensation in fiscal 2010 was in equity, approximately: (1) 71 percent of total compensation for the chief executive officer was in equity, 18 percent was in base salary, and 11 percent in short-term incentive; and (2) "53 [percent] (on average) of total compensation for" executives other than the chief executive officer was in equity, 25 percent in base salary, and 14 percent in short-term incentive.

    Based on competitive data, Jacobs during fiscal 2010, as part of its retention strategy and further alignment with shareholders, granted additional stock options and longer vesting restricted stock to its executive officers including the chief executive officer.

7

## 2. *The January 2011 Supplemental Proxy*

The supplemental Proxy began with a summary of Jacobs's performance compared to peer companies. It is this comparison that plaintiffs maintain is misleading and inaccurate.

After the comparisons, the Proxy noted that "during the last two years Jacobs experienced intense competition for its top talent," losing two of its vice-presidents to a direct competitor, with other executives "being actively recruited by other competitors." During its normal compensation review in May 2010, "the Compensation Committee considered mechanisms to strengthen the retention on Jacobs's executives while at the same time maintaining the historic focus on a conservative compensation program with total compensation levels at or below the median of its peers."

The Compensation Committee relied on data provided by Cook, its independent consultant, "that showed Jacobs's executives' pay was generally well below the median." Compensation for Jacobs's chief executive officer compared poorly to Jacobs's peers, and unlike its peers, Jacobs had "no retirement programs that provide additional retention value, no employment agreements with its executive management, and no severance arrangements."

As a result of this data, Jacobs "decided, for the first time, to make a one-time grant of shares of restricted stock to the company's executives. To provide sufficient retention incentive, these grants were generally made with a five-year cliff vesting period, which is well beyond the normal range for most equity grants."

## C. Defendants' Demurrer

Defendants demurred to the operative complaint on several grounds, including that the pleading was insufficient to excuse a pre-suit demand on the Board due to futility. On defendants' motion, the trial court took judicial notice of various documents filed by Jacobs with the SEC and judicial notice of the contents of the report of Institutional

Shareholder Services, Inc., recommending shareholders vote to disapprove the compensation plan. The court had previously taken judicial notice of the Proxy. (Plaintiffs do not challenge the judicial notice rulings on appeal.) In a 17-page ruling, the court sustained the demurrer without leave to amend, ruling in part, that the complaint failed to allege demand futility.

## DISCUSSION

Plaintiffs contend the trial court erred in concluding they had not sufficiently alleged pre-suit demand futility under the two-pronged test of *Aronson v. Lewis* (Del. 1984) 473 A.2d 805 (*Aronson*), overruled on other grounds in *Brehm v. Eisner* (2000) 746 A.2d 244, 253 (*Brehm*). They argue the allegations show reason to doubt the Board members were independent, because they face personal liability for breach of their fiduciary duties by adopting a compensation plan that did not conform to Jacobs's pay-for-performance criteria, misleading Jacobs's shareholders regarding Jacobs's performance, issuing false statements regarding compensation, and failing to act in Jacobs's best interests. Plaintiffs additionally argue they alleged sufficient facts to create a reason to doubt whether the executive compensation plan reflected a valid exercise of business judgment. We disagree.

## A. Standard of Review

"The standard of review on appeal from a judgment dismissing an action after the sustaining of a demurrer without leave to amend is well established. 'The function of a demurrer is to test the sufficiency of the [pleading] as a matter of law, and it raises only a question of law. [Citations.] On a question of law, we apply a de novo standard of review on appeal.' (*Holiday Matinee, Inc. v. Rambus, Inc.* (2004) 118 Cal.App.4th 1413, 1420.) [¶] The reviewing court gives the pleading a reasonable interpretation and treats the demurrer as admitting all material facts properly pleaded. (*Blank v. Kirwan* [(1985)]

9

39 Cal.3d [311,] 318).  The reviewing court does not, however, assume the truth of contentions, deductions or conclusions of law.  (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.)  'The judgment must be affirmed "if any one of the several grounds of demurrer is well taken.  [Citations.]"  [Citation.]  However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. . . .  [Citation.] . . .  (*Aubry v. Tri–City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)"  (*First Aid Services of San Diego, Inc. v. California Employment Development Dept.* (2005) 133 Cal.App.4th 1470, 1476-1477.)

The adequacy of the pleading of pre-suit demand futility may be resolved at the pleading stage of litigation, a ruling we review de novo.  (*Brehm*, *supra*, 746 A.2d at pp. 253-254.)  "The well-pleaded factual allegations of the derivative complaint are accepted as true on such a motion."  (*Rales v. Blasband* (1993) 634 A.2d 927, 931 (*Rales*).)  "Obviously, if the complaint fails to allege sufficient facts which, if true, would demonstrate the futility of a demand, it is entirely appropriate to terminate the action on a motion to dismiss."  (*Oakland Raiders v. National Football League* (2001) 93 Cal.App.4th 572, 586 (*Oakland Raiders*), citing *Werbowsky v. Collomb* (2001) 362 Md. 581; *Shields v. Singleton* (1993) 15 Cal.App.4th 1611, 1619 (*Singleton*).)  We therefore assess the sufficiency of the pleading under the *Aronson* test.

**B.  The Pre-Suit Demand Requirement and Futility Doctrine**

California law precludes the filing of a derivative shareholder action unless the "plaintiff alleges in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and alleges further that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file."  (Corp. Code, § 800, subd. (b)(2).)  Jacobs is incorporated in Delaware, so we apply Delaware law to determine if the pleading states a cause of action.  (*Villari v. Mozilo*

(2012) 208 Cal.App.4th 1470, 1478, fn. 8 (*Villari*).) "[T]here is no dispute that Delaware substantive law applies in this case pursuant to the internal affairs doctrine, codified at Corporations Code section 2116, which provides that the law of the place of incorporation governs the liability of directors to the corporation and its shareholders." (*Villari, supra,* at p. 1479, fn. 9.)

"When it is clear that making a demand upon the company's board of directors would be futile, the demand requirement may be excused. *See Aronson*[, *supra*], 473 A.2d [at p.] 815 (laying out standard for demand futility). In order to excuse the demand requirement, a derivative complaint must allege particularized facts creating a 'reasonable doubt' that: (1) the directors were disinterested and independent; or (2) the challenged transaction was the product of a valid exercise of business judgment. *See* [*ibid.*]; *see also Brehm*[, *supra*,] 746 A.2d [at p.] 256. If either prong is satisfied, then a plaintiff has met the demand futility burden and the demand requirement is excused. *See In re Intel Corp. Derivative Litig.,* 621 F.Supp.2d 165 (D. Del. 2009) [(*Intel*)]. If a plaintiff fails to satisfy the first prong of *Aronson,* there is a presumption that the board's actions were the product of a valid exercise of business judgment. *See Beam v. Stewart,* 845 A.2d 1040, 1049 (Del. 2004) [(*Beam*)]; *see also Intel,* 621 F.Supp.2d at [p.] 170. Under the second prong of *Aronson,* 'plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision.' *In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 808, 824 (Del. Ch. 2005) [(*In re J.P. Morgan Chase*)]." (*Rynd*, *supra*, U.S. Dist. LEXIS at pp. *12-13; see *In re Verisign, Inc., Derivative Litig.* (N.D. Cal. 2007) 531 F.Supp.2d 1173, 1188.)

Delaware pleading requirements are strict—"general, conclusory facts are insufficient. ([*Singleton,*] *supra*, 15 Cal.App.4th at p. 1622.) And facts relating to the structural bias common to corporate boards throughout America are also insufficient. ([*Aronson,*] *supra*, 473 A.2d at p. 815, fn. 8; cf. *Kaplan v. Wyatt* (Del. 1985) 499 A.2d 1184, 1189-1190 [allegations of natural bias not supported by tangible evidence of an interest on the part of a special litigation committee in the outcome of the litigation do not

11

demonstrate a lack of independence].)  The proof must be of 'facts specific to each director from which [the trier of fact] can [find a reasonable doubt] that that particular director could or could not be expected to fairly evaluate the claims of the shareholder plaintiff.' ([*Singleton*], *supra*, [at p. 1622]; see also [*Aronson*], *supra*, [at p. 815], fn. 8 ['specific facts pointing to bias on a particular board will be sufficient for determining demand futility'].)"  (*Oakland Raiders*, *supra*, 93 Cal.App.4th at p. 587.)

### 1.  *Aronson's* First Prong—Directors Are Independent and Disinterested

#### a.  Independence of the Directors

Plaintiffs do not argue that the complaint supports a reasonable doubt that the Jacobs' directors are independent.  There are 11 directors on the Board, 10 of whom are independent and are not covered by the executive compensation plan.  The one exception is Martin, who is president and chief executive officer and is one of the recipients of the executive compensation plan.  However, there is no allegation he had a controlling interest in the corporation or exercised undue influence over the Board.

#### b.  Disinterested Directors

Plaintiffs argue they have alleged facts sufficient to create a reasonable doubt that the individual directors are disinterested because they are subject to personal liability for their conduct.  Contrary to plaintiffs' contention, our de novo review establishes the vague, conclusory, and nonspecific allegations in the complaint are insufficient as a matter of law to create a doubt as to the disinterest of the directors on the theory they are exposed to personal liability.

"[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board

approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists. *See Gimbel v. Signal Cos., Inc.,* Del. Ch., 316 A.2d 599, *aff'd,* Del. Supr., 316 A.2d 619 (1974); *Cottrell v. Pawcatuck Co.,* Del.Supr., 128 A.2d 225 (1956)." (*Aronson*, *supra*, 473 A.2d at p. 815; accord, *Strong ex rel. Tidewater, Inc. v. Taylor* (E.D. La. 2012) 877 F.Supp.2d 433, 447; *In re Citigroup Inc. S'holder Derivative Litig.* (Del. Ch. 2009) 964 A.2d 106, 121.)

"Delaware law presumes that a corporation's board of directors is disinterested and independent. *See FLI Deep Marine LLC v. McKim,* 2009 Del. Ch. LEXIS 56, 2009 WL 1010290, at *3 (Del. Ch. Apr. 21, 2009). To rebut that presumption under the first prong of *Aronson,* Plaintiff must undertake a 'director-by-director analysis' showing that a majority of the Board was incapable, due either to a material personal interest or domination and control, of objectively evaluating a demand, if made. *See Postorivo v. AG Paintball Holdings,* 2008 WL 553205, at *7 (Del. Ch. Feb.29, 2008)." (*Rynd*, *supra*, U.S. Dist. LEXIS at p. *29.)

Plaintiffs have not engaged in the director-by-director analysis required by Delaware law, as explained in *Rynd* and the authorities it cites. Instead, plaintiffs (and the dissent) rely on general, identical allegations as to each member of the Board, with no attempt to allege with particularity how each individual Board member acted in a way that violated his or her fiduciary duty. This is insufficient.

Plaintiffs rely on their vague allegation that each Board member "issued" the 2010 Proxy. Plaintiffs' pleading does not explain how an individual director is able to "issue" a proxy on behalf of a corporation, and "conclusory allegations of fact or law contained in the complaint need not be considered true in determining demand futility unless they are supported by specific facts. *Grobow* [*v. Perot*]*,* 539 A.2d [180,] 187 [(Del. 1988)]; *Kaufman v. Belmont,* 479 A.2d 282, 285 (Del. Ch. 1984)." (*Starrels v. First Nat. Bank* (C.A. 7 Ill. 1989) 870 F.2d 1168, 1171.) Plaintiffs do not allege what role, if any, directors played in preparation of the Proxy, nor do they allege that any Board member signed or ratified the Proxy. (See *In re Keithley Instruments, Inc., Derivative Litig.* (N.D. Ohio 2008) 599 F.Supp.2d 875, 895-896 ["In this case, Plaintiffs allege no facts

explaining what role, if any, each individual director played in the alleged wrongdoing. Plaintiffs repeatedly allege that the options backdating was 'knowing and intentional,' but make no particularized allegations regarding whether or when any director knew of the alleged options manipulation, or that any director intentionally backdated any option grant."].)

Allegations that a member of a board of directors signed a document constituting an illegal act or containing a false statement act are insufficient to raise a doubt that a director is disinterested. Plaintiffs have not alleged the Board members signed the Proxy, but even if they had, that fact alone would be insufficient to establish potential personal liability of the directors as a matter of pleading, as explained in *Rahbari v. Oros* (S.D. N.Y. 2010) 732 F.Supp.2d 367, 380: "Plaintiff argues that each of the defendants face a substantial likelihood of liability because each signed the 2007 10–K. Without more, however, the signing of financial reports is insufficient to create an inference that the directors had actual or constructive notice of any illegality for purposes of the demand excused analysis. *Wood,* 953 A.2d at 142[,] citing *Guttman* [*v. Huang* (Del. Ch. 2003)] 823 A.2d [492,] 498 (dismissing complaint that was 'devoid of any pleading regarding the full board's involvement in the preparation and approval of the company's financial statements' and of 'particularized allegations of fact demonstrating that the outside directors had actual or constructive notice of the accounting improprieties.'); *see also Seminaris* [*v. Landa* (Del. Ch. (1995)] 662 A.2d [1350,] 1354 (rejecting plaintiff's contention that signatures on misleading submissions to the SEC were sufficient to establish a substantial likelihood of liability for conspiring to misrepresent the stock price)."

We agree with and follow the analysis in *Rynd*, a case involving factual allegations legally indistinguishable from those alleged here against defendants: the directors of Hercules Offshore, Inc., assisted by Cook, adopted an executive compensation plan based on principles similar to those relied on to support Jacobs's compensation plan; the plan raised compensation between 40-190 percent for Hercules's executives, which was disapproved in a nonbinding vote of shareholders under Dodd-Frank by a margin of 52-

14

48 percent; and the Board members had "issued" a proxy statement urging approval of the plan, even though "Hercules was not performing well. In 2010, the Company posted a net operating loss of $1.17 per share, which represented an $85.4 million, or 11 [percent], decline in total revenue compared to the prior year. [Citation.] The Company also experienced a $300 million decrease in total assets, a $100 million decrease in net cash from operating activities, an almost 13 [percent] (more than $100 million) decrease in stockholder equity, and a drop in stock price to $3.48 per share, a decline of more than $1 per share." (*Rynd*, *supra*, U.S. Dist. LEXIS at pp. *9-10.)

Hercules and Cook moved to dismiss the action in *Rynd* on the grounds the plaintiffs had failed to allege sufficient facts to demonstrate pre-suit demand futility, and the complaint failed to sufficiently allege facts constituting a cause of action. (*Rynd*, *supra*, U.S. Dist. LEXIS at p. *5.) The *Rynd* court agreed on both grounds. We limit our discussion to the futility portion of the analysis.

In holding the plaintiffs in *Rynd* had failed to allege demand futility, the court first corrected the faulty implication in the *Rynd* complaint that a board of director's must respond to a negative vote by shareholders under Dodd-Frank. The court explained that such shareholder votes: (1) are explicitly nonbinding; (2) may not be construed to overrule a decision by the board of directors; (3) do not create or change directors' fiduciary duties; and (4) do not restrict or limit the ability of shareholders to make proposals for inclusion in proxy materials relating to executive compensation. (*Rynd*, *supra*, U.S. Dist. LEXIS at pp. *23-24.) "Plaintiff's allegations and arguments in this litigation fail to recognize these realities of Dodd-Frank." (*Id.* at p. *24.)

*Rynd* then turned to a second flaw in the pleadings in that case, focusing on language in the complaint which is substantially similar to plaintiffs' allegations in the instant case. The plaintiff in *Rynd* had alleged that the proxy statement "issued" by the members of Hercules's board of directors "discloses: [¶] Our compensation committee will continue to design compensation arrangements with the objectives of emphasizing pay for performance and aligning the financial interests of our executives with the interests of long-term stockholders." (*Rynd*, *supra*, U.S. Dist. LEXIS at p. *24.) *Rynd*

15

described the plaintiff's allegation as "selective in his characterization of the Company's compensation plan. A fuller understanding of that plan, as disclosed in the Proxy Statement on which Plaintiff relies for his claim, reveals serious flaws in Plaintiff's case. [¶] It is true that Hercules' Proxy Statement explains that 'pay for performance' is part of the 'philosophy and objectives' of the Company's compensation programs. [Citation.] However, the same statement also identifies other goals[,]" including: (1) attracting, retaining, motivating, and rewarding executive officers; (2) aligning the interests of the executive officers with those of stockholders; (3) pay for performance; (4) ensuring that performance-based compensation does not encourage excessive risk taking; and (5) increasing retention by requiring forfeiture of a substantial portion of an executive officer's compensation upon voluntary termination of employment. (*Rynd*, *supra,* U.S. Dist. LEXIS at pp. *25-26.)

As the *Rynd* court explained, "One of these goals merits particular discussion in light of Plaintiff's allegations. This is the Company's goal of retaining its executive officers, a goal that may have taken on increased importance precisely because of the difficult financial circumstances in which the Company found itself in and around 2010. As the Proxy Statement explains: [¶] The Board of Directors and its Compensation Committee . . . remain committed to retaining the existing management team, and as a result, have offered cash retention incentives to recover some of the shortfall in long-term incentive compensation levels. While a portion of the awards are delivered solely upon continued employment, the majority of such awards are earned only if the company achieves specific performance goals during the year. **This 'Incentive and Retention Plan' was implemented in 2010, and covers both the 2010 and 2011 fiscal years.** The committee believes that the implementation of this plan has been critical in deflecting efforts by competitors that can offer attractive compensation opportunities, and in keeping the management team focused on executing the current business strategy for future shareholder value creation. [¶] [Citation.] ([Emphasis added.]) The goal of retaining an executive could, under certain circumstances, lead to increased executive

16

compensation even if the Company is experiencing poor financial performance." (*Rynd*, *supra*, U.S. Dist. LEXIS at pp. *26-27.)

"Moreover, the Proxy Statement explains that total executive compensation is based not only on the Company's performance, but also on factors including 'advice from a compensation consultant, established corporate goals and objectives, company performance targets, personal performance objectives, and the compensation paid by the company's competitors.' [Citations.] In addition, as Defendants observe, Plaintiff's allegations 'incorrectly presume that executive compensation is solely awarded retrospectively . . . . As is common practice in executive compensation, the Proxy Statement makes clear that much of the Company's executive compensation is prospective.' [Citation.] [¶] Hence, Plaintiff's characterization of the Hercules executive compensation policy as essentially mandating a strong correlation between certain financial aspects of the Company's performance and the compensation of the Company's executives is incorrect." (*Rynd*, *supra*, U.S. Dist. LEXIS at pp. *27-28.) The factors identified in *Rynd* apply with equal force to plaintiff's complaint in the instant case.

Having resolved these preliminary issues, the *Rynd* court turned to the merits of the issue of demand futility, finding the pleading inadequate as a matter of law. "The Court concludes, however, that Plaintiff has failed to allege particularized facts sufficient to create a reasonable doubt that: (1) a majority of the directors are independent and disinterested, or (2) the challenged conduct was a valid exercise of business judgment, thereby excusing demand." (*Rynd*, *supra*, U.S. Dist. LEXIS at pp. *28-29.) Directors are presumed to be "disinterested and independent," in the absence of a "'director-by-director analysis' showing that a majority of the Board was incapable, due either to a material personal interest or domination and control, of objectively evaluating a demand, if made," and the plaintiff "has failed to engage in a director-by-director analysis; nor has he demonstrated that a majority of the Board lacked the requisite independence or suffered from any disabling interest. ([Citation;] *see also Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 363 (Del. 1993) ('This Court has never held that one director's

17

colorable interest in a challenged transaction is sufficient, without more, to deprive a **board** of the protection of the business judgment rule presumption of loyalty.').)" (*Rynd*, *supra*, at pp. 29-30.) "Thus, the motions to dismiss based on lack of demand will be granted. All claims against all defendants will be dismissed." (*Id.* at p. *32.)

Based on the vague and conclusory pleading that the directors "issued" the Proxy, the incomplete description of the May 2010 executive compensation plan, and lack of any director-by-director analysis, we hold plaintiffs have failed to allege facts creating a reasonable doubt the members of the Board were interested in the litigation due to potential personal liability. We next turn to the second prong of the *Aronson* test.

### 2. Second Prong of the *Aronson* Test—Transaction is the Product of a Valid Exercise of Business Judgment

Our resolution of the first prong of the *Aronson* test also leads to rejection of plaintiffs' arguments that the Board's conduct was not a valid exercise of business judgment. "If the first prong is not satisfied, there is a presumption that the Board's actions were the product of a valid exercise of business judgment. [*Beam*[, *supra*,] 845 A.2d [at p.] 1049.] Thus, to satisfy the second prong, a plaintiff must plead sufficient particularized facts to 'raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision.' *In re J.P. Morgan Chase*[, *supra,*] 906 A.2d [at p.] 824 (quoting *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 286 (Del. Ch. 2003)) (citations omitted)." (*Taylor v. Kissner* (D. Del. 2012) 893 F.Supp.2d 659, 665-666.)

"'A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation.' *Aronson*[, *supra*]*,* 473 A.2d [at p.] 811; *accord, Spiegel v. Buntrock,* 571 A.2d 767, 772-73 (Del. 1990); *see* 8 Del. C. § 141(a) (1992)." (*Stepak ex rel. Southern Co. v. Addison* (C.A. 11 Ga. 1994) 20 F.3d 398, 402.) Matters of executive compensation are left to the wide discretion of the directors, absent an allegation the

18

compensation is so large and disproportionate to be unconscionable and constitute waste. (*Brehm*, *supra*, 746 A.2d at p. 262, fn. 56; *Grimes v. Donald* (Del. 1996) 673 A.2d 1207, 1215, overruled on another point in *Brehm*, *supra*, at p. 253.)

Plaintiffs have not alleged facts sufficient to overcome the presumption that when the Board adopted the executive compensation plan in May 2010, it did so in good faith in order to attract and maintain qualified executives, reward them for superior performance with incentives, encourage their retention and performance with an equity stake in the company, and align the executives' interests with those of the shareholders. Plaintiffs' allegations did not dispute that two executives had left the company and that others were being recruited by competitors. These circumstances alone constitute a valid basis for the Board's business decision to adopt the compensation plan, and not abandon it, after the shareholder vote.

The goal of retaining key executives during poor economic circumstances is entirely reasonable in order to attempt to minimize the effects of a major economic downturn on a company. Urging an affirmative shareholder vote on a compensation plan recommended by an independent consultant is within the business judgment discretion of the Board.

The pleading does not establish the executive compensation plan was so ill-conceived and irrational as to violate the business judgment rule, nor is waste alleged. Allegations the Board improperly supported the plan during the shareholder vote, and stuck with it after the negative vote, do not begin to approach the level of pleading necessary to overcome the presumption of the business judgment rule.

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to defendants and respondents.


KRIEGLER, J.


I concur:


O'NEILL, J.*

---

*      Judge of the Ventura County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

Charter Township of Clinton Police et al. v. Craig L. Martin et al.
B241087
MOSK, J., Concurring and Dissenting

      I concur as to all causes of action except the first cause of action for breach of fiduciary duty in connection with the 2010 executive compensation program. I recognize that for the most part, courts have rejected "say on pay"[1] cases challenging executive compensation disapproved by shareholders. (See, e.g., *Robinson Family Trust v. Greig* (N.D. Ohio, May 10, 2013, No. 5:12 CV 1713) 2013 WL 1943330; *Raul v. Rynd* (D. Del. 2013) __ F.Supp.2d. __ [2013 WL 1010290]; see Sargent and Honabach (2013) D&O Liab. Hdbk. § 110; Fairfax, *Sue on Pay: Say on Pay's Impact on Directors' Fiduciary Duties* (2013) 55 Ariz. L.Rev. 1, 25 (Fairfax)[2]; but see *NECA-IBEW Pension Fund ex rel. Cincinnati Bell, Inc. v. Cox* (S.D. Ohio, Sept. 20, 2011, No. 1:11–cv–451) 2011 WL 4383368.) Nevertheless, I believe here plaintiffs have alleged something more than just shareholder disapproval of executive compensation. Those allegations are sufficient at the pleading stage to state a cause of action for breach of fiduciary duty.

      Because Jacobs Engineering Group, Inc. (the Company) is incorporated in Delaware, the parties agree that Delaware law governs the Company's internal affairs. (Corp. Code, § 2116; *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1106, fn. 2.) Moreover, California courts "properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes." (*Oakland Raiders v. NFL* (2001) 93 Cal.App.4th 572, 586, fn. 5, citing *Shields v. Singleton* (1993) 15 Cal.App.4th 1611, 1621.) Because this case is pending in California, California law

---

[1]     "Sign on pay" is a term used for the right of shareholders to vote on executive compensation.

[2]     Another recent article discusses some conflicting rulings. (See Nelson, *Ending the Silence: Shareholders Derivative Suits and Amending the Dodd-Frank Act so "Say on Pay" Votes May be Heard in the Boardroom* (2012) 20 U. Miami Bus. L.Rev. 149, 180 (Nelson).)

applies regarding pleading procedures and whether the pleading states sufficient facts to constitute a cause of action. (See *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1542, fn. 8; Code Civ. Proc., § 430.10.)

Plaintiffs did not allege that they made a pre-suit demand upon the Company's Board of Directors (the Board) to pursue the claim. The Delaware Supreme Court in "*Aronson* [*v. Lewis* (Del. 1984) 473 A.2d 805 (*Aronson*), overruled on other grounds in *Brehm v. Eisner* (2000) 746 A.2d 244, 253 (*Brehm*)] held that a court, in deciding whether a plaintiff will be excused from making a demand on the board, must evaluate 'whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'" (*Bader v. Anderson* (2009) 179 Cal.App.4th 775, 791; see also *Oakland Raiders v. NFL, supra*, 93 Cal.App.4th at p. 587.) "[T]he two-prong test under *Aronson* is disjunctive; accordingly, there is demand excusal if either prong is satisfied. (*Brehm, supra,* 746 A.2d at p. 256.)" (*Bader v. Anderson, supra,* 179 Cal.App.4th at pp. 790-791, fn. omitted; see generally, 1 Balotti and Finklestein's Delaware Law of Corporations and Business Organizations (3d ed. 2013) § 13.14, pp. 13-52 to 13-53 (Balotti).)

Delaware courts have said "demand will be excused based on a possibility of personal director liability only in the rare case when a plaintiff is able to show director conduct that is 'so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.'" (*In re Citigroup Inc. Shareholder Derivative Litigation* (Del. Ch. 2009) 964 A.2d 106, 121, fn. omitted.) As stated by the court in *Aronson, supra,* 473 A.2d at page 812, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." "[O]nly where 'a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was not the product of a valid exercise of business judgment . . . is demand excused.'" (Balotti, *supra,* at § 13.14, p. 13-53, quoting *Aronson, supra,* 473 A.2d at p.

2

815; see generally 2 McLaughlin on Class Actions (9th ed. 2012) § 9:12 (McLaughlin); see also Corp. Code, § 800, subd. (b)(2) [specificity required for alleging reasons for not making a demand on the board of directors].)

As this case arises on appeal from a judgment based on the trial court's order sustaining a demurrer, we assume the truth of the facts alleged in the complaint and the reasonable inferences that may be drawn from those facts. (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 883.) We must liberally construe the pleadings ""'"with a view to attaining substantial justice among the parties."' [Citations.]" (*Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1, 32.)

Plaintiffs allege that the Board adopted the 2010 executive compensation program and that, in connection with the adoption of that program, each of the Board members "issu[ed]" the 2010 Proxy Statement requesting that the shareholders vote to approve the 2010 executive compensation program. Plaintiffs further allege that in the proxy statement, the Board made "the Company's terrible financial results appear to be far better than they were . . . ;" and the Board "tr[ied] to spin" the Company's poor financial results in comparison with its peer companies and engaged in a "false campaign" of misrepresentations and lies, all of which plaintiffs specify in detail. Plaintiffs also allege that the compensation plan was inconsistent with the Board's preferred pay for performance standard, with the Company's poor financial results, and with the Company's performance measured against the performance of its peers.

At the pleading stage, under California standards, it is reasonable to infer from plaintiffs' specific allegations that each of the directors had actual or constructive knowledge that the peer group comparison misrepresentations contained in the 2010 Proxy Statement were false; each director participated in making intentionally false representations regarding the Company's financial status compared with those of the peer companies in an attempt to obtain a favorable shareholder vote on the 2010 executive compensation program previously adopted by the Board; and these facts reflect that the Board's compensation program was inappropriate.

3

The Dodd-Frank Wall Street Reform and Consumer Protection Act (15 U.S.C. § 78n-1) requires publicly-traded companies to permit shareholder votes on executive compensation, but provides that the vote shall not be binding (15 U.S.C. § 78n-1(c)). Yet, there are suggestions that something more than a vote of the shareholders disapproving a compensation package may rebut the business judgment rule presumption. (*Laborers' Local v. Intersil* (N.D. Cal. 2012) 868 F.Supp.2d 838, 849 [vote of 56 percent of shareholders disapproving of the company's executive compensation package "alone is not enough to rebut the presumption of the business judgment rule," but granted leave to amend to allege additional facts supporting plaintiff's claim of demand futility]; *Iron Workers Local No. 25 Pension Fund ex rel Monolithic Power Systems, Inc. v. Bogart* (N.D. Cal., June 13, 2012, No. 11–4604 PSG) 2012 WL 2160436 * 4 ["the 64% negative vote by shareholders does not, on its own, rebut the business judgment presumption"].)

Here, in addition to the shareholders' vote rejecting the Board's proposed 2010 executive compensation program, plaintiffs allege the following additional facts: the Board ignored its own "pay for performance" standards; the Board rejected an independent institution's recommendation; and in the 2010 Proxy Statement, requesting shareholder approval of the 2010 executive compensation program, the Board portrayed the Company's financial results in a false light, and most importantly, lied about the Company's performance compared with peer companies. This false impression of the Company's performance was not corrected in a supplemental proxy statement. Plaintiffs sufficiently allege that there was a reasonable doubt as to whether the challenged transaction—the Board's adoption of the 2010 executive compensation program—was the product of a valid exercise of business judgment and that there was a breach of fiduciary duty. Such allegations are also sufficient at the pleading stage to show decisions of the directors so violated the business judgment rule as to excuse the demand upon them.

Because plaintiffs sufficiently allege facts to establish a breach of the duty of loyalty, defendants are not exculpated from liability for implementing and maintaining the 2010 executive compensation program by a provision in the Company's certificate of

4

incorporation, authorized by Delaware law, which restricts the Board's liability for certain breaches of fiduciary duty. The Company's certificate of incorporation states, "[A] director of this [Company] shall not be personally liable to the [Company] or its shareholders for monetary damages for breach of fiduciary duty as a director, except that this Article . . . shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the [Company] or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under Section 174 of the Delaware General Corporation Law; or (iv) for any transaction from which the director derived an improper personal benefit." (See Del. C., title 8, § 102(b)(7).)

Exculpatory provisions cannot be the basis for dismissal when a plaintiff alleges facts sufficient to support the inference that the disclosure violation was made in bad faith, knowingly, or intentionally. "Directors' disclosure obligations arise out of both the fiduciary duty of care and loyalty. A claim for breach of the fiduciary duty of disclosure implicates only the duty of care when the factual basis for the alleged violation suggests that the violation was made as a result of a good faith, but nevertheless, erroneous judgment about the proper scope or content of the required disclosure. However, where a complaint alleges or pleads facts sufficient to support the inference that the disclosure violation was made in bad faith, knowingly or intentionally, the alleged violation implicates the duty of loyalty." (*O'Reilly v. Transworld Healthcare, Inc*. (Del. Ch. 1999) 745 A.2d 902, 915, fns. omitted.)

When a plaintiff has "averred sufficient circumstantial evidence to permit the inference that one or more defendants may have knowingly withheld material information from the Company's shareholders," then such allegations may be deemed to implicate a "violation of the directors' duty of loyalty . . . , and this would not warrant immunity under the exculpatory clause of the Company's corporate charter." (*In re Reliance Sec. Litig*. (D. Del. 2000) 91 F.Supp.2d 706, 731-732.) "Put simply, if a complaint *properly* pleads a non-exculpated claim, that claim at least survives a motion to dismiss." (*Orman v. Cullman* (Del. Ch. 2002) 794 A.2d 5, 41.) "[T]o the extent that

5

directors have engaged in conscious wrongdoing . . . , the exculpatory charter provision does not insulate those from fiduciary duty claims." (*Production Resources Group, L.L.C. v. NCT Group, Inc.* (Del Ch. 2004) 863 A.2d 772, 795, overruled on other grounds in *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla* (Del. 2007) 930 A.2d 92, 102, fn. 43.)

The allegations of the misrepresentation concerning the peer group comparisons, coupled with plaintiffs' allegation that the shareholders voted to disapprove of the Company's executive compensation program, sufficiently allege that the Board acted in bad faith in connection with its decision to implement the 2010 executive compensation program so that any exculpatory clause is not applicable. (See 2 McLaughlin, *supra,* § 9.12.) Defendants have the burden to establish the application of the exculpatory clause. (*Emerald Partners v. Berlin* (Del. 1999) 726 A.2d 1215, 1223-1224; see *Sanders v. Wang* (Del. Ch., Nov. 8, 1999, No. 16640) 1999 WL 1044880 * 11 ["use of exculpatory provisions to shield fiduciaries from personal liability presents an affirmative defense not amenable to pre-trial disposition"].)

For all of the reasons stated above, plaintiffs sufficiently allege that there is a reasonable doubt that the Board's adoption of the 2010 executive compensation program was the product of a valid exercise of business judgment. Plaintiffs adequately plead facts that establish that a pre-suit demand would have been futile as to the first cause of action. As noted, because the issue of the futility of the demand upon the Board is intertwined with the business judgment rule, for the same reasons that the allegations are sufficient at the pleading stage to overcome the demand requirement, those allegations are also sufficient to state a cause of action for a breach of fiduciary duty. (See Fairfax, *supra,* 55 Ariz. L.Rev. at p. 25 ["Despite shareholders' efforts to link say on pay with directors' duties, say on pay suits have been dismissed at the pleading stage with overwhelming frequency . . . such dismissals are a mistake because they ensure that fiduciary duty law plays virtually no role in the current reform effort"].) And the allegations are sufficient at the pleading stage to render inapplicable the exculpatory

clause.  The allegations are more appropriately dealt with at post-pleading stages of the litigation than by way of a demurrer.

I would reverse as to the first cause of action only.  Plaintiffs' other causes of action against the individual defendants did not, inter alia, allege sufficient facts showing harm so as to constitute causes of action.  As to the causes of action against Cook & Co., plaintiffs have not adequately set forth what provision of the Cook & Co. contract was breached nor alleged the required scienter for Cook & Co. to be an aider and abettor of a breach fiduciary duty.

In connection with the increasing number of shareholder derivative actions concerning executive compensation, "[t]he issue of shareholders being able to control executive compensation will be part of the legal discussion for the foreseeable future." (Nelson, *supra,* 20 U. Miami Bus. L.Rev. at p. 209.)


MOSK, J.