Filed 12/14/15  Wodka v. Causeway Capital Management CA32/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| STEVEN H. WODKA,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>CAUSEWAY CAPITAL MANAGEMENT LLC et al.,<br><br>        Defendants and Respondents. | B255454<br><br>(Los Angeles County<br>Super. Ct. BC463623) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lee Smalley Edmon, Judge.  Affirmed.

Nicomedes S. Herrera; Simmons Hanly Conroy and Crystal G. Foley for Plaintiff and Appellant.

Munger Tolles & Olson, John W. Spiegel and Ronald K. Meyer for Defendants and Respondents John Gavin and Eric Sussman.

K&L Gates (Washington D.C.) and Nicholas G. Terris (pro hac vice); K&L Gates (Los Angeles), Michael J. Quinn, Kevin S. Asfour and Christina N. Goodrich for Defendants and Respondents Causeway Capital Management LLC, Sarah H. Ketterer, Harry W. Hartford, James A. Doyle, Jonathan P. Eng, Kevin Durkin, Turner Swan, Gracie V. Fermelia and Mark Cone.

Paul Hastings, Thomas A. Zaccaro, Eleanor K. Mercado for Defendant and Respondent Causeway Capital Management Trust.

_____

# INTRODUCTION

Steven Wodka filed this shareholder derivative action on behalf of Causeway Capital Management Trust, a Delaware trust in which Wodka invested part of his IRA portfolio. The trust, through one of its five mutual funds, had purchased shares of two internet gambling businesses, PartyGaming and NETeller, both of which were listed only on foreign stock exchanges. After the United States government prosecuted the principals of PartyGaming and NETeller for violating federal gambling laws, the stock prices of PartyGaming and NETeller fell, and the fund lost money on its investments in those companies. Wodka alleged that, by investing in the internet gambling businesses, the trust's investment management company, and certain officers and directors of the investment management company and of the trust, breached their fiduciary duties, were negligent and committed waste, and that the investment management company breached its contract with the trust.

Under Delaware law, which the parties agree applies, a shareholder may not bring a derivative action unless the board of directors has wrongfully refused a pre-suit demand that the directors pursue the claim, or the shareholder alleges that he or she is excused from making such a demand because the directors are incapable of making an impartial decision about whether to pursue the claim. Wodka did not make a pre-suit demand, and the trial court concluded that Wodka's amended complaint did not sufficiently allege an excuse for his failure to do so. Therefore, the court sustained the defendants' demurrer without leave to amend, and dismissed the action. We conclude that Wodka's allegations, regarding events both before and after he filed this derivative action, did not excuse him from making a pre-suit demand, and that the trial court properly sustained the demurrers without leave to amend.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.      *The Allegations*

1.      *The Parties*

Causeway Capital Management Trust is a statutory trust organized under Delaware law and based in California.[1]  The trust is a "series" mutual fund, which means that it offers investors different mutual-fund options, each with a portfolio of securities.

Steven Wodka became a shareholder in the trust in 2004 through his investment in one of these funds, the "Causeway International Value Fund."  He still owns the shares he bought in 2004.

Causeway Capital Management LLC (CCM) is an investment management company that serves as the investment advisor to all five of the trust's funds.  According to the complaint, CCM "controls the Trust" and "selects and appoints the Trust's executives and its entire board of trustees."  The individual named defendants are all either trustees or officers of the trust, or officers or directors of CCM.[2]

When Wodka filed this action, the trust had five trustees, three of whom,

---

[1]      Causeway Capital Management Trust is a nominal defendant in this action. "When a derivative suit is brought to litigate the rights of the corporation, the corporation is an indispensable party and must be joined as a nominal defendant." (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108; accord, *Sternberg v. O'Neil* (Del. 1988) 550 A.2d 1105, 1124.)  "Although named a defendant, [the corporation in a derivative suit] is the real party in interest . . . .  The proceeds of the action belong to the corporation and it is bound by the result of the suit." (*Ross v. Bernhard* (1970) 396 U.S. 531, 538.)

[2]      Sarah Ketterer is the chief executive officer, co-founder, and a member of CCM. Harry Hartford is the president, co-founder, and a member of CCM.  James Doyle, Jonathan Eng, and Kevin Durkin are directors of CCM.   Hartford, Doyle, Eng, and Durkin are portfolio managers of the fund, but they are not trustees of the trust. Turner Swan is the president and secretary of the trust, and a member of CCM.  Gracie Fermelia is the chief compliance officer of the trust, and the chief operating officer and a member of CCM.  Mark Cone is a trustee of the trust, and chief marketing officer and a managing partner of CCM.  John Gavin and Eric Sussman are trustees of the trust.

Mark Cone, John Gavin, and Eric Sussman, are defendants in this action. Gavin and Sussman became trustees in 2001 (before Wodka invested in the fund), and Wodka did not allege they were employed by or otherwise affiliated with CCM. Wodka alleged that Cone, the only trustee with a dual role at CCM because he also served as the chief marketing officer and managing partner of CCM, was one of the individuals responsible for "the day-to-day management of the Trust and for implementing the strategy complained of herein with respect to the Fund." The other two trustees were John Graham and Lawry Meister, who became trustees in 2008 (after the fund had invested in PartyGaming and NETeller), and they are not defendants.

### 2. *The Gambling Investments*

Between April and December 2006 the fund bought shares of two offshore internet gambling businesses that were publicly traded in overseas capital markets: PartyGaming and NETeller. The federal government eventually prosecuted both companies.

PartyGaming, a Gibraltar company, offered on-line gamers real-money and free-play games, including poker and casino gambling. Shares publicly traded on the London Stock Exchange. In its prospectus, PartyGaming disclosed that approximately 87 percent of its revenue came from customers in the United States, and that the Department of Justice "consider[ed] that companies offering online gaming to US residents are in violation of existing US federal laws . . . ."

By June 30, 2006 the fund had bought almost 16 million shares of PartyGaming stock at a cost of approximately $34 million. As the United States government cracked down on internet gambling websites that had taken bets from gamblers in the United States, the share prices of PartyGaming fell. According to Wodka, "Once federal and state law enforcement commenced the crackdown on illegal Internet gambling businesses in 2006, the market re-priced the value of the shares of the illegal gambling businesses to exclude in whole or in part revenues derived from the US." Nevertheless, the fund bought more PartyGaming stock during this time, so that by December 2006 the fund owned more than 35 million shares of PartyGaming stock.

The fund sold its shares of PartyGaming only after PartyGaming had stopped taking bets from gamblers in the US. By that time, the value of PartyGaming's stock had plummeted over 80 percent. In December 2008 one of the co-founders of PartyGaming, Anarug Dikshit, pleaded guilty in the United States District Court for the Southern District of New York to engaging, through PartyGaming, in illegal internet gambling and agreed to forfeit $300 million to the government.

In its Annual Report for the fiscal year ending September 30, 2007 the trust disclosed that its investments in PartyGaming had been a "significant detractor" to the fund's overall performance. Nevertheless, in 2006 the fund had an overall positive return of approximately 26 percent, which was well above the performances of the Dow Jones Industrial Average and S&P 500 index, which increased 16 percent and 14 percent, respectively, over the same time period.

NETeller, an Isle of Man company, traded on the London Stock Exchange's Alternative Investment Market beginning in April 2004. By April 31, 2006 the fund owned 46,312 shares of NETeller, and the fund increased its investment in NETeller at the same time the fund was increasing its investment in PartyGaming. By September 30, 2006 the fund owned 1,203,112 shares of NETeller stock.

In early 2007, the government began prosecuting NETeller and its co-founders, Stephen Lawrence and John Lefebvre. NETeller admitted criminal wrongdoing and forfeited $136 million in criminal proceeds as part of a Deferred Prosecution Agreement. Lawrence and Lefebvre admitted criminal wrongdoing, agreed to forfeit $100 million in criminal proceeds, paid additional fines of $1.75 million, and were each sentenced to 45 days' imprisonment plus one year of supervised release.

### 3. *The Trustees' Alleged Role in the Gambling Investments*

Wodka alleged in his operative first amended complaint that the trustees caused or allowed "the Fund to invest or to continue its investments" in PartyGaming and NETeller. Wodka alleged that the defendants were "responsible for causing the Fund to make the illegal investments," and that "each of the Defendants knowingly developed

and implemented an investment strategy pursuant to which the Trust, though the Fund, was to participate in the illegal profits from Internet gambling companies" and "therefore caused the Fund repeatedly and over a significant period of time to purchase shares in 'illegal gambling businesses.'" Wodka further alleged that each of the defendants "knowingly developed and implemented an investment strategy pursuant to which the Trust [was caused] repeatedly and over a significant period of time to purchase shares in 'illegal gambling businesses' . . . ."

According to the first amended complaint, the defendants "conducted or caused to be conducted, or were reckless in failing to conduct or to cause to be conducted, due diligence before the Fund purchased stock in illegal gambling businesses. Before making any investment, CCM conducts thorough company-specific fundamental analysis, including extensive external and internal research, company visits and proprietary quantitative valuations. Accordingly, [each defendant] knew, or is deemed to have known, that they were causing the Fund to purchase stock of companies that were taking bets from gamblers in the US." Wodka also alleged that the trustees "had a duty to ensure that each of the funds that compose the Trust had proper control mechanisms to ensure that it did not make any investments in any illegal gambling businesses." Wodka alleged that "[t]he defendant Trustees, who compose a majority of the board of trustees, also have disabling interests and lack independence because they face a substantial likelihood of criminal and civil liability for wrongs that constitute, among other things, crimes, bad faith, gross negligence, willful misfeasance, reckless disregard of duty, and violation of Defendants' duty of loyalty."

B.     *Procedural History*

1.     *The Prior Federal Action*

Wodka initially filed an action in federal court against the same defendants, alleging that they had violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 United States Code section 1961 *et seq.*, and asserting state-law claims for breach of fiduciary duty, negligence, and waste. The alleged predicate crime under RICO

6

was violating 18 United States Code section 1955, which makes it a crime to "own[ ] all or part of an illegal gambling business." On October 8, 2009 the district court dismissed the RICO claim for failure to plead proximate cause, and the court declined to exercise supplemental jurisdiction over the state law claims.

The Ninth Circuit affirmed on May 16, 2011, holding that "the district court correctly dismissed Wodka's claims for lack of proximate causation under RICO." (*Wodka v. Causeway Capital Management LLC* (9th Cir. 2011) 433 Fed. Appx. 563, 564.) "Wodka's losses," the Ninth Circuit explained, "were directly caused by a series of intervening actions undertaken by independent, third party actors during the summer and fall of 2006, including the passage of the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.*, several law enforcement actions taken against two other Internet-based gambling companies, PartyGaming's withdrawal from the U.S. market, and various decisions made by investors to sell off their shares of PartyGaming and NETeller stock." (*Ibid.*)

### 2. *This Action*

Wodka filed this action on June 15, 2011, the day before the statute of limitations would have expired. He alleged the same state-law claims he had alleged in the federal action—breach of fiduciary duty, negligence, and waste—and that the district court had dismissed without prejudice. Wodka brought the breach of fiduciary duty and negligence claims derivatively on behalf of the corporation, as well as individually and on behalf of a class of investors. He brought the waste claim only derivatively. Wodka did not make a demand on the board before filing his derivative claims.

In early 2012 Wodka "suggested to Defendants . . . that [he] would consider making a demand" if the trustees agreed to stay the case or toll the applicable statutes of limitations while they considered the demand. The trustees rejected this proposal and refused to enter into a tolling agreement that would have allowed Wodka to dismiss the case without prejudice and refile it later if the trustees ultimately decided not to bring the claims on behalf of the trust.

7

The defendants demurred to Wodka's original complaint and to the amended complaint. In response to the first demurrer, Wodka conceded that the trial court should sustain without leave to amend the demurrer to his individual and class claims, which the court did. The court sustained the demurrer to the derivative claims with leave to amend, and Wodka filed an amended complaint that added an additional derivative claim for breach of contract against CCM only.

The defendants again demurred, and the trial court sustained the defendants' demurrers without leave to amend and dismissed the amended complaint. The court noted that the defendants' "primary argument" was that Wodka had "failed to make a pre-suit demand on the Board of Trustees before pursuing his derivative claims." On that issue, the court ruled that Wodka's "new allegations that 'all defendants actually knew or should have known that it was *illegal* to invest' in PartyGaming and NETeller [citation] are premised upon the erroneous legal conclusion that Defendants' conduct was actually illegal. [Wodka's] additional allegations grounded in that incorrect conclusion do not excuse the pre-suit demand requirement." The court held that, "even if one could conceivably read [United States Code] section 1955 to include passive investment in a publicly traded company, [Wodka] does not allege a substantial likelihood that the trustees would be found liable for tortious conduct committed in bad faith," because Wodka did not "specifically allege facts to suggest that the decision to invest in PartyGaming and NETeller was so obviously illegal that the trustees *consciously decided to engage in criminal activity*" by passively investing in publicly traded stock listed on an international exchange."

The court concluded that because a majority of the trustees did not face a substantial likelihood of liability, Wodka's failure to make a demand was not excused on those grounds. The court ruled that the requirement of a pre-suit demand was not excused by allegations that a majority of the board was inherently conflicted or "interested" because the allegations of the trustees' involvement with CCM concerned conduct that was "routine practice," and did not "'negate independence for demand excusal purposes.'" Finally, the court ruled that the trustees' refusal to stay the litigation

8

or toll the statute of limitations did not render a pre-suit demand futile. The court ruled, "Were a board's resistance to litigation itself evidence of demand futility, there would be no jurisprudence on the matter at all because the question of demand futility only arises when [the] board expresses opposition to litigation. This is not the law, however, and Plaintiff's additional allegations on this score demonstrate nothing more than his own delay in considering a demand and in bringing the action."

## DISCUSSION

### A. *Standard of Review*

We review de novo the trial court's ruling dismissing Wodka's shareholder derivative action for failure to allege demand futility. (See *Villari v. Mozilo* (2012) 208 Cal.App.4th 1470, 1477.) "Like the trial court, we assume the truth of all properly pleaded factual allegations" (*Leyte-Vidal v. Semel* (2013) 220 Cal.App.4th 1001, 1007), but, also like the trial court, we do not assume the truth of "contentions, deductions or conclusions of law." (*Charter Township of Clinton Police and Fire Retirement System v. Martin* (2013) 219 Cal.App.4th 924, 933 (*Charter Township*).) "When a demurrer 'is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.'" (*Eckler v. Neutrogena Corp.* (2015) 238 Cal.App.4th 433, 438). The plaintiff has the burden of proving that the trial court abused its discretion in denying leave to amend. (*Ibid.*)

### B. *The Pre-Suit Demand Requirement*

#### 1. *Choice of Law*

The parties agree that Delaware substantive law determines the requirements of a pre-suit demand Wodka must satisfy in order to sue derivatively on behalf of the trust. (See *Kamen v. Kemper Fin. Servs., Inc.* (1991) 500 U.S. 90, 92 (*Kamen*) ["the scope of

9

the demand requirement embodies the incorporating State's allocation of governing powers within the corporation"]; *Bezirdjian v. O'Reilly* (2010) 183 Cal.App.4th 316, 322 [parties agreed that Delaware law applied to Delaware corporation].)  The parties disagree, however, whether Delaware law (Delaware Chancery Court Rules, rule 23.1(a)) or California law (Corp. Code, § 800, subd. (b)(2)) determines whether the allegations in a complaint are sufficient to state a derivative claim.  (Compare, e.g., *Jones v. Martinez* (2014) 230 Cal.App.4th 1248, 1253-1254 [applying Delaware Chancery Court Rules, rule 23.1, but also citing Corp. Code, § 800, subd. (b)(2)] with *Charter Township*, *supra*, 219 Cal.App.4th at p. 934 [applying Corp. Code, § 800, subd. (b)(2), but also citing Delaware cases] and *Shields v. Singleton* (1993) 15 Cal.App.4th 1611, 1621 (*Shields*) [applying Corp. Code § 800 after noting that California and Delaware law do not conflict on this point].)  Because both California and Delaware require a plaintiff to plead demand futility "with particularity," and because Wodka has not pleaded demand futility with the requisite particularity under either California or Delaware law, we need not decide which state's pleading standard governs.  Under either state's pleading rules, the trial court properly dismissed Wodka's amended complaint.[3]

---

[3]     Corporations Code section 800, subdivision (b)(2), has an additional pleading requirement not found in Delaware law: the plaintiff must allege that he or she "has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file."  In a footnote, Wodka asserts that "[t]his requirement is substantive and therefore inapplicable," but he provides no authority for or argument in support of this assertion.  In any event, Wodka argues that he has satisfied this requirement because the complaint alleged that the board "kn[ew] [about] the claims . . . since April 23, 2009."  Wodka appears to argue that he complied with Corporations Code section 800, subdivision (b)(2), because his prior federal complaint included the same state-law claims he alleged in this action and therefore he gave the defendants actual notice of his claims.  Because we conclude that Wodka did not allege demand futility with the requisite particularity, we need not decide whether the trial court also should have dismissed Wodka's complaint for failure to comply with Corporations Code section 800, subdivision (b)(2).

2.      *The Demand Requirement and the Futility Exception*

In general, a company's board of directors rather than any single shareholder determines whether and when to file a lawsuit on behalf of the corporation.  (See, e.g., *Kamen*, *supra*, 500 U.S. at pp. 101-102; 8 Del.C. § 141(a).)  "[T]he right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation."  (*Rales v. Blasband* (Del. 1993) 634 A.2d 927, 932; see Del. Code Ann., tit. 12, § 3816, subd. (a) ["[a] beneficial owner may bring an action in the Court of Chancery in the right of a statutory trust to recover a judgment in its favor if persons with authority to do so have refused to bring the action or if an effort to cause those persons to bring the action is not likely to succeed"].)  "[C]onsistent with the long-standing principle that directors and not shareholders manage a corporation, the Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare."  (*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Raines* (D.C. Cir. 2008) 534 F.3d 779, 782-783 [applying Delaware law].)

There are two tests for analyzing demand futility under Delaware law: the *Aronson* test and the *Rales* test.  The *Aronson* test applies when a derivative plaintiff challenges an affirmative decision by the board to act or refrain from acting.  (*Aronson v. Lewis* (Del. 1984) 473 A.2d 805, 814 overruled on another ground by *Brehm v. Eisner* (Del. 2000) 746 A.2d 244, 253-254.)  The *Rales* test applies where the subject of a derivative suit is not a board decision but rather a board's inaction leading to an alleged violation of the board's oversight duties.  (*Rales*, *supra*, 634 A.2d at p. 934.)  "The spirit that clearly animates each test is a Court's unwillingness to set aside the prerogatives of a board of directors unless the derivative plaintiff has shown some reason to doubt that the board

11

will exercise its discretion impartially and in good faith."[4] (*In re INFOUSA, Inc. Shareholders Litigation*, *supra*, 953 A.2d at p. 986.)

To allege futility under the *Aronson* test, a plaintiff must satisfy either of two prongs: "The first prong of the futility rubric is 'whether, under the particularized facts alleged, a reasonable doubt is created that . . . the directors are disinterested and independent.' The second prong is whether the pleading creates a reasonable doubt that 'the challenged transaction was otherwise the product of a valid exercise of business judgment.'" (*Brehm v. Eisner*, *supra*, 746 A.2d at p. 256.) Under the first prong of *Aronson*, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." (*Aronson*, *supra*, 473 A.2d at p. 815.) "In order for demand to be excused under the second prong of *Aronson*," a plaintiff "must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." (*In re Walt Disney Co. Derivative Litigation* (Del. Ch. 2003) 825 A.2d 275, 286.) "These rare cases include those in which a board decides to undertake illegal activity." (*Rosenbloom v. Pyott* (9th Cir. 2014) 765 F.3d 1137, 1149.)

"The *Rales* test requires that the plaintiff allege particularized facts establishing a reason to doubt that 'the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" (*Wood v. Baum* (Del.

---

[4] Even where the underlying conduct alleged in the complaint constitutes corporate wrongdoing, the Board retains the power to refuse to sue "if it deem[s] the litigation would be contrary to the corporation's best interests." (*Bezirdjian*, *supra*, 183 Cal.App.4th at p. 325 [applying Delaware law].) In other words, the business judgment rule applies not just to the underlying conduct, but also to the decision to sue or not to sue. (See *Aronson*, *supra*, 473 A.2d at p. 813.) "It is within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation or harm its long-term strategic interests." (*In re INFOUSA, Inc. Shareholders Litigation* (Del. Ch. 2007) 953 A.2d 963, 986.)

2008) 953 A.2d 136, 140 (*Wood*).)  "Under *Rales*, directors who face a 'substantial likelihood of personal liability are deemed to be interested and, thus, cannot make an impartial decision regarding demand.'" (*Hartsel v. Vanguard Group, Inc.* (Del. Ch. June 15, 2011) 2011 WL 2421003, at p. 25, aff'd, 38 A.3d 1254 (Del. 2012) (*Hartsel*).)  "But, demand will be excused on this basis 'only in the rare case' where a plaintiff can demonstrate director conduct that is 'so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.'" (*Ibid.*)  Thus, "[u]nder either approach [*Aronson* or *Rales*], demand is excused if Plaintiffs' particularized allegations create a reasonable doubt as to whether a majority of the board of directors faces a substantial likelihood of personal liability for breaching the duty of loyalty." (*Rosenbloom v. Pyott*, *supra*, 765 F.3d at p. 1150.)  In attempting to allege demand futility under *Aronson* or *Rales*, the derivative plaintiff is "entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." (*Brehm v. Eisner, supra*, 746 A.2d at p. 255; see *Charter Township*, *supra*, 219 Cal.App.4th at p. 935 ["'general, conclusory facts are insufficient,'" and "'facts relating to the structural bias common to corporate boards throughout America are . . . insufficient'"]; *Oakland Raiders v. National Football League* (2001) 93 Cal.App.4th 572, 587 [conclusory facts are not sufficient to allege demand futility].)

Wodka does not distinguish between *Aronson* or *Rales* or argue which of the two tests applies to his claims.  Instead, he cites both cases and argues implicitly that he satisfied both tests because his allegations create a reasonable doubt regarding whether a majority of the board of directors faces a substantial likelihood of liability.  Under this theory, Wodka satisfied the demand futility test under either *Aronson* or *Rales* if he alleged, for a majority of the board, "facts specific to each [trustee] from which [the court] can conclude that that particular [trustee] could or could not be expected to fairly evaluate" his claims.  (See *Shields*, *supra*, 15 Cal.App.4th at p. 1622 [evaluating demand futility in a derivative action on behalf of a Delaware company without explicitly applying *Aronson* or *Rales*]; *Seminaris v. Landa* (Del. Ch. 1995) 662 A.2d 1350, 1354

13

["substantial likelihood of director liability" would satisfy *Aronson*]; *In re Dow Chemical Co. Derivative Litigation* (Del. Ch., Jan. 11, 2010) 2010 WL 66769 at p. 12 ["'substantial likelihood of personal liability'" would satisfy *Rales*].) Wodka, however, did not do so.

C.     *The First Amended Complaint Does Not Allege Demand Futility with the Requisite Particularity*

Although Wodka did not allege how many trustees were on the board, the parties do not dispute that there were five trustees when Wodka filed this action. Two of the trustees (Graham and Meister) were not trustees when the trust invested in PartyGaming and NETeller; Wodka did not allege that they were unable to consider a shareholder demand fairly and properly. One of the trustees, Mark Cone, is an officer of CCM, and the defendants do not argue that he was independent or in a position to properly consider a demand from Wodka. (See Del. Code Ann., tit. 12, § 3801, subd. (d)); *Hartsel*, *supra*, 2011 WL 2421003, at p. 21; see also *Jones v. Harris Associates L.P.* (2010) 559 U.S. 335, 338 [describing the typical role of an investment advisor to a mutual fund].) The remaining two trustees, Gavin and Sussman, did not have positions at CCM. Thus, whether Wodka satisfied the *Aronson* or *Rales* test for demand futility turns on whether he alleged with particularity that Gavin and Sussman could not properly evaluate a demand.

Wodka did not allege with particularity any involvement by Gavin and Sussman in the investments in PartyGaming and NETeller.[5] The first amended complaint did not allege with particularity that Gavin or Sussman retained control over the trust's investment decisions, or whether or how they approved the decision to invest in

_____

[5]     The trust's Declaration of Trust provides that trustees may "delegate such authority as they consider desirable to any . . . investment adviser . . . or other agent or independent contractor." (See *Stone ex rel. AmSouth Bancorporation v. Ritter* (Del. 2006) 911 A.2d 362, 372 [most corporate decisions "'are, of course, not the subject of director attention'"].)

14

PartyGaming or NETeller. Instead, Wodka alleged only that the trustees as a group "allowed" the fund to invest or to continue to invest in PartyGaming and NETeller, that the defendants are "responsible" for the investments, and that they "knowingly developed and implemented" the investment strategy. The only non-conclusory allegation that Gavin and Sussman even knew of the investments was that the trust disclosed the investments in public filings.[6] The only allegation of any specificity was that, "[b]efore making any investment, CCM conducts thorough company-specific fundamental analysis, including extensive external and internal research, company visits and proprietary quantitative valuations." Wodka, however, did not plead with particularity why Gavin and Sussman could not evaluate his claims against CCM impartially and in good faith. The general allegations that CCM "controls the Trust" and "selects and appoints" the board are insufficient. (See *Aronson*, *supra*, 473 A.2d at p. 816 ["it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election" because "[t]hat is the usual way a person becomes a corporate director"]; see also *Jones*, *supra*, 559 U.S. at p. 338 [the "typical" arrangement is that "[t]he adviser selects the fund's directors, manages the fund's investments, and provides other services"].)

Wodka argues that the trustees violated several federal and state laws, including 18 United States Code section 1955 (which makes it a crime to "own" part of an illegal gambling business), Penal Code section 337j, subdivision (a)(2) (which makes it unlawful for any person as owner to receive revenue for keeping, running, or carrying on any controlled game), and the California common law (which Wodka asserts makes wrongful the seeking of "profit from the wrongdoing of another"). Wodka, however, did not allege with particularity that Gavin or Sussman decided to invest in PartyGaming or NETeller, or ratified those investments, or that they did so knowing that their conduct was illegal. Thus, Wodka did not sufficiently allege under Delaware law that Gavin or Sussman faced a substantial likelihood of liability for the allegedly criminal conduct.

---

[6] Wodka also alleged that those public filings disclosed that the trust voted its minority shares in NETeller.

15

(See *Wood*, *supra*, 953 A.2d at pp. 141-142 [a "serious threat of liability" for allegedly criminal conduct may only be found where the plaintiff pleads a non-exculpated claim, *alleging with particularity* that the defendants knowingly engaged in particular conduct and that they knew that the conduct was illegal].)

Moreover, the trust's Declaration of Trust exculpates trustees from civil liability unless they acted with "willful misfeasance, bad faith, gross negligence, or reckless disregard." Where, as here, the "directors are exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally improper."[7] (*Wood, supra*, 953 A.2d at p. 141.) Wodka did not allege that Gavin or Sussman knew or should have known that the trust's passive investment in offshore internet gambling businesses through foreign stock purchases was illegal. Indeed, the trust publicly disclosed the trusts' investments in its SEC filings, and the parties agree nobody has ever been prosecuted for similar investments.[8]

Wodka's allegation that demand is excused because the board committed waste fails for the same reasons. Wodka argues that the trust "should not have paid *anything* for shares in illegal gambling businesses, because such investments could only be profitable if U.S. laws were successfully violated." Even assuming this allegation states a

---

[7] We reject Wodka's argument that "[t]he common law presumption that everyone is deemed to know the criminal laws is sufficient to establish constructive knowledge." Were that the law, the "actual or constructive knowledge" requirement would be meaningless when applied to illegal activity. (See *Wood*, *supra*, 953 A.2d at p. 142 ["the Complaint alleges many violations of federal securities and tax laws but does not plead with particularity the specific conduct in which each defendant 'knowingly' engaged, or that the defendants knew that such conduct was illegal"].)

[8] Wodka argues that "[e]xculpation based on exculpatory clauses . . . is an affirmative defense that . . . . cannot be resolved in the context of a demurrer." The Delaware Supreme Court has explained, however, that when evaluating the claim that a plaintiff has not complied with the stringent futility pleading requirements, "it must be kept in mind" if an "exculpation provision . . . exempts . . . directors from all liability except in case of 'fraudulent or illegal conduct.'" (*Wood*, *supra*, 953 A.2d at p. 141.)

16

claim for waste, Wodka did not allege with particularity, against Gavin, Sussman, or the two non-defendant trustees, claims that are not exculpated by the Declaration of Trust's provisions.

Wodka's conclusory allegation that "[t]he Trustees also had a duty to ensure that each of the funds that compose the Trust had proper control mechanisms to ensure that it did not make any investments in any illegal gambling businesses" does not excuse demand because the only factual allegation that the trust did not have proper control mechanisms in place was that the trust made the investments. (See *Stone ex rel. AmSouth Bancorporation v. Ritter, supra,* 911 A.2d at p. 373 [a "bad outcome" does not imply "bad faith"].) Wodka did not allege any specifics about what kind of control mechanisms would have been "proper," or what each trustee did or failed to do to institute or remove such controls. Moreover, "imposition of liability [on a lack of oversight theory] requires a showing that the directors knew that they were not discharging their fiduciary obligations," (*id.* at p. 370) and Wodka did not allege that Gavin or Sussman (or the two non-defendant trustees) had that knowledge.

Wodka's reliance on *Rosenbloom v. Pyott*, *supra*, 765 F.3d 1137 is misplaced. In *Rosenbloom*, the derivative plaintiffs alleged that demand on the corporation's board was futile because the board knew or should have known about the company's illegal, off-label marketing of Botox. (*Id.* at pp. 1150-1151.) The plaintiffs in that case, however, alleged far more particularity than Wodka alleged. The plaintiffs in *Rosenbloom* "allege[d] with particularity that the Board continued to closely and regularly monitor off-label Botox sales." (*Id.* at p. 1152.) The plaintiffs alleged that the board "discussed and decided to continue funding" to promote the off-label use of Botox, watched a slide show about the prevalence of disorders for which Botox was an off-label treatment, reviewed promotional documents for a program to support physicians seeking reimbursement for off-label uses, and approved agreements designed to facilitate off-label promotion. (*Ibid.*) Unlike the defendants in this case, the defendants in *Rosenbloom* never argued that they did not know that off-label advertising was illegal, nor could they have done so because the Allergen board had "received repeated FDA

17

warnings about illegal promotion of Botox." (*Id.* at p. 1153.) Wodka did not allege that an enforcement agency ever warned the trust that its investments were illegal.

Thus, the first amended complaint did not allege any facts that Gavin or Sussman could not have fairly evaluated a pre-suit demand. (See *Shields*, *supra*, 15 Cal.App.4th at p. 1622.) The first amended complaint did not contain any allegations about the two other, non-defendant trustees. Therefore, the first amended complaint did not allege that a majority of the five-person board would not have been able to properly consider a pre-suit demand. (See *Blaustein v. Lord Baltimore Capital Corp.* (Del. 2014) 84 A.3d 954, 958 ["a plaintiff must allege with particularity that a majority of the board lacks independence or is otherwise incapable of validly exercising its business judgment"].) Wodka did not meet his burden of alleging with particularity the futility of making a demand on the trust before he filed his derivative action on behalf of the trust.

D.      *The Allegations Regarding the Board's Post-Filing Conduct Do Not Excuse Demand*

Wodka argues that the board abdicated its responsibility for determining whether to proceed with this litigation because the board refused, after Wodka filed this action, to agree to stay the proceedings or toll the statutes of limitations so that Wodka could make a post-filing demand. Wodka argues that the trustees "were presented with an easy opportunity to consider a demand while preserving investors' claims from forfeiture, and they rejected it."

As Gavin and Sussman explain, this argument is flawed: "If [Wodka's] position were upheld, pre-suit demand would never be required because every derivative plaintiff could file suit and then ask the board to agree to stay proceedings and/or toll limitations so that the plaintiff could make a post-filing demand. If the board refused, the plaintiff could argue, as [Wodka] does here, that pre-suit demand is therefore excused. If the board agreed, the plaintiff would be allowed to make a demand after filing the complaint, notwithstanding the plaintiff's violation of the specific statutory requirement of a demand

18

(or excise) before filing." Essentially, Wodka's approach would eliminate the statutory pre-suit demand requirement, so that a shareholder could make a demand prior to filing a derivative action, after filing a derivative action, or anytime the shareholder deemed it appropriate. Delaware law is to the contrary. (See Del. Code Ann., tit. 12, § 3816(a); *Wood*, *supra*, 953 A.2d at p. 140; *Ryan v. Gursahaney* (Del. Ch. 2015) 2015 WL 1915911, at p. 5; *Canty v. Day* (S.D.N.Y. 2014) 13 F.Supp.3d 333, 342 [applying Delaware law].)

Citing *Rich ex rel. Fuqi Intern., Inc. v. Yu Kwai Chong* (Del. Ch. 2013) 66 A.3d 963 (*Fuqi*), Wodka argues that the defendants' post-filing actions rendered a meaningful response to a litigation demand unlikely or impossible. *Fuqi*, however, involved very different circumstances. The plaintiff in *Fuqi* made a pre-suit demand, and the corporation did not respond for two years. (*Id.* at p. 965.) The court held that "[t]he Plaintiff [had] pled with particularity facts that create a reasonable doubt that the Fuqi board [had] acted in good faith in investigating the Plaintiff's demand." (*Id.* at p. 979.) Wodka never made a pre-suit demand.

Wodka argues that, "even under a 'demand futility' analysis, modern cases permit courts to consider post-filing conduct in appropriate cases," and that in this case the board "abjured and repudiated any effective authority to make . . . a decision" about whether to prosecute Wodka's claims. According to Wodka, "the Board in this case attempted to make a meaningful decision *impossible* by actively seeking to cause the forfeiture of [Wodka's] claims before the Board could even investigate a litigation demand or impartially consider it." Wodka's logic is backwards. It was Wodka's delay in waiting until the eve of the expiration of the statute of limitations to pursue this derivative action, without having made a demand, that left the board with little or no time to consider his demand. Indeed, under Wodka's theory, the fact that the defendants demurred to Wodka's complaint based on the statute of limitations would also evidence an unwillingness to proceed with the litigation, and therefore would support demand futility. Again, Delaware law is to the contrary. (See *Aronson*, *supra*, 473 A.2d at pp. 809-810 ["futility is gauged by the circumstances existing at the commencement of a derivative

19

suit," which "disposed of plaintiff's argument that defendants' motion to dismiss established board hostility and the futility of demand"].)

The cases cited by Wodka involving post-filing conduct and demand futility involved factual scenarios not present here. For example, *In re American Intern. Group, Inc*. (Del. Ch. 2009) 965 A.2d 763 (*AIG*) involved a "unique circumstance" in which the board, post filing, appointed a special litigation committee to investigate the claims. (*Id.* at pp. 775, 807.) The special litigation committee "chose to take no position[,] . . . and thus demand was futile." (*Id.* at p. 807.) The court in *AIG* recognized that it was not dealing with "the typical situation where a corporation is objecting to litigation brought in its name." (*Id.* at p. 808.) To the contrary, by "tak[ing] no position and permit[ting] the Stockholder Plaintiffs to proceed," the special litigation committee "recognized that the Stockholder Plaintiffs would go forward without the demand requirement being a barrier to their claims." (*Id.* at p. 809.) As Gavin and Sussman correctly explain, "Unlike *AIG*, *this* lawsuit is the 'typical situation' addressed 'in *Aronson* and its progeny' where 'a corporation is objecting to litigation brought in its name' and filed a 'motion[] to dismiss for failure to make demand.' [Citation.] Unlike *AIG*, [the defendants] have not 'permit[ted] the Stockholder Plaintiff[ ] to proceed.'"

Wodka cites *Spiegel v. Buntrock* (Del. 1990) 571 A.2d 767 as an example of how "Delaware courts routinely consider post-filing events in determining demand futility." The court in *Spiegel*, however, determined that the plaintiff's post-filing demand mooted the plaintiff's demand-futility argument. (*Id.* at p. 775; see *Kamen*, *supra*, 500 U.S. at p. 105 ["Delaware law does not permit a shareholder to make a demand and later to assert its futility"].) Contrary to Wodka's argument, the Delaware Supreme Court explained that "'[w]hen deciding a motion to dismiss for failure to make a demand under Chancery Rule 23.1 the record before the court *must be restricted to the allegations of the complaint*.'" (*Spiegel*, at p. 774, emphasis added.) The effect of making a post-filing demand is to "make[ ] his original contention, that demand was excused, moot," because "[b]y making a demand, a stockholder tacitly acknowledges the absence of facts to support a finding of futility." (*Id.* at p. 775.) Here, Wodka never made a demand on the

20

board.  In fact, under *Spiegel* the only inference from Wodka's post-filing conduct of offering to make an untimely demand is that he "tacitly acknowledges the absence of facts to support a finding of futility."  (*Ibid.*)

Finally, Wodka argues that "there is nothing blameworthy" in having waited to file this lawsuit until the expiration of the statute of limitations because he had been "zealously pursu[ing] civil RICO claims in federal court" in an attempt "to maximize recovery for injured investors."  Wodka asserts that he was "forced to file this action on the last day before the expiration of the statutes of limitations."  Wodka, however, could have made a pre-suit demand before he filed his federal court action, or after the federal district court dismissed the action (more than one year before the Ninth Circuit affirmed the dismissal).  Wodka did not allege that the trust is responsible for his failure to file a pre-suit demand.  That was Wodka's strategic decision; if demand were truly futile then it would not matter how soon before the expiration of the statute of limitations he filed his complaint.  Under Delaware law Wodka had to choose between making a pre-suit demand or alleging demand futility (see *Spiegel*, *supra*, 571 A.2d at p. 775), and he chose to attempt the latter.

E.     *The Trial Court Did Not Abuse Its Discretion in Denying Leave to Amend*

The burden of proving that there is a reasonable possibility that a pleading defect can be cured by amendment "is squarely on the plaintiff."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; accord, *Arce v. County of Los Angeles* (2012) 211 Cal.App.4th 1455, 1471; *Long v. Century Indem. Co.* (2008) 163 Cal.App.4th 1460, 1468.)  The trial court sustained the demurrer to the first amended complaint without leave to amend, determining that "[t]he scarcity of new allegations [in the first amended complaint] and their legal insignificance only highlights the fact that the true deficiencies in Plaintiff's complaint are of law, not of insufficient pleading."  Wodka has not met his burden to prove that there is a reasonable possibility of curing the defect in his complaint.  He did not request leave to amend his first amended complaint in the trial court, and on appeal he does not argue that the trial court should have given him a second opportunity to

21

amend his complaint.  Nor does Wodka suggest how he would amend the first amended complaint to correct the insufficiencies of his demand futility allegations.  The trial court did not abuse its discretion in denying leave to amend.

**DISPOSITION**

The judgment is affirmed.  The request for judicial notice filed by Gavin and Sussman on November 25, 2015 is denied.  Respondents are to recover their costs on appeal.


SEGAL, J.

We concur:



ZELON, Acting P. J.



BECKLOFF, J.[*]


---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.